**William BLANCHARD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–0302–CR–104.**

Court of Appeals of Indiana.

Jan. 13, 2004.

Loren J. Comstock, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, William Blanchard (Blanchard), appeals his conviction for Count I, murder, a felony, Ind.Code § 35–42–1–1, Count III, neglect, a Class B felony, I.C. § 35–46–1–4, and his adjudication as a habitual offender.

We affirm.

### ISSUES

Blanchard raises seven issues on appeal, which we restate as follows:

1. Whether the trial court abused its discretion by denying Blanchard's Motion to Sever Counts involving each of his twin sons;

2. Whether the loss of photographs, portraying the twin boys as happy and healthy, warrants a reversal of Blanchard's conviction for Count III, neglect;

3. Whether the trial court abused its discretion when it admitted Blanchard's videotaped statement into evidence;

4. Whether the trial court abused its discretion by giving Final Jury Instruction No. 10 in its original form;

5. Whether Blanchard's trial counsel's performance was so defective as to result in ineffective assistance of counsel;

6. Whether the State presented sufficient evidence to sustain Blanchard's conviction for Count I, murder; and

7. Whether the trial court abused its discretion by allowing the State to file a belated habitual offender enhancement on the day of trial.

### FACTS AND PROCEDURAL HISTORY

Blanchard and Yvette Hughes (Hughes) first met through a telephone dating service in Louisville, Kentucky, in June of 2000. Shortly after their meeting, Hughes became pregnant with twin boys. They decided to move to Indianapolis where Blanchard worked for a courier service. On February 14, 2001, Hughes delivered twin sons, Willon and Willeek, at Wishard Hospital. After their initial stay with Blanchard's mother in Indianapolis, the family periodically lived in motels and their car.

In April 2001, Blanchard, Hughes, and the twins lived at the Red Roof Inn on the north side of Indianapolis. Occasionally, in order to stop the boys from crying, Blanchard would tie a twice-folded washcloth over the mouths of the infants. On April 26, 2001, the family was in the car near 56th Street and Georgetown Road. After having just been fed and changed, Willon started to cry excessively. Blanchard became upset since he saw no reason as to why the infant would be crying. Again, in order to cease the crying, Blanchard placed a twice-folded washcloth over Willon's mouth and tied it with an Ace Bandage around the back of the child's neck. Willon was placed back in his car seat and ignored for a couple of hours. Upon returning to the hotel that night, Blanchard took the twins up to the room. Noticing that Willon was no longer breathing, Blanchard administered CPR. Attempts to revive the infant failed.

Blanchard decided to dispose of Willon's body which he wrapped and placed inside two garbage bags. Together with Hughes and Willeek, Blanchard drove to a wooded location in Boone County, Indiana. Along the way Blanchard stopped at a store to acquire a shovel and a pair of gloves. Finding a remote spot in a drainage ditch, he exited the car, taking Willon's body with him, leaving Hughes and Willeek in the vehicle. After digging, Blanchard placed the garbage bag with the infant's body inside the shallow grave, and covered it with dirt and leaves. Blanchard, Hughes, and Willeek returned to Indianapolis. From May through July, the family continued to alternatively live in motels and their car.

In the early morning hours of July 7, 2001, an altercation ensued between Blanchard and another man at the Country Hearth Inn. Sergeant Robert Campbell of the Marion County Sheriff's Department (Sergeant Campbell) received a dispatch call to investigate the disturbance. After speaking with Blanchard, who was very upset, Sergeant Campbell approached Blanchard's car to talk to Hughes. When Hughes opened the passenger side door of the car, Sergeant Campbell observed a small child in a car seat located behind the driver's seat of the vehicle. Because he found Willeek's physical condition to be very disturbing, Sergeant Campbell summoned emergency personnel. Although Blanchard proclaimed his son to be perfectly healthy, the paramedics nevertheless determined the infant to be emaciated and in need of medical care. Willeek was transported to Wishard Hospital by ambulance.

Dr. Heather Slaven (Dr. Slaven) examined Willeek in the emergency room. Although Willeek's birth weight was approximately five pounds and nine ounces, nearly five months later, his weight had remained the same. Subsequent tests revealed that due to chronic malnutrition, dehydration, and iron deficiency, Willeek was anemic. He was unable to roll over, reach out, and grab objects because of his absence of muscle mass.

Later that morning on July 7, 2001, while Willeek was in emergency care, Blanchard called the hospital and identified himself as Willeek's father. Blanchard informed Dr. Slaven that Willeek's eating habits and health were good. He further explained that since the formula gave the infant diarrhea, he had been feeding Willeek three to four jars of baby food a day. Upon Dr. Slaven's questioning about the pregnancy and delivery, Blanchard responded that the arrival of twins was a surprise. Dr. Slaven immediately inquired as to the other twin—Blanchard refused to answer any questions regarding Willon.

When Dr. Slaven received Blanchard's phone call, Michael Duke, an off-duty police officer with the Indianapolis Police Department (Officer Duke), was working as a part-time security guard at Wishard's emergency room. Using the Indianapolis Police Department's (IPD) communication system, Officer Duke learned that Blanchard was phoning from a pay phone located on a public parking lot at 10th Street and Indiana Avenue. Officer Duke dispatched a police officer to the pay phone in an attempt to locate Willeek's twin brother.

IPD Officer Emanuel Toliver (Officer Toliver) received the radio run to the pay phone. Upon his arrival, he noticed an individual using the pay phone fitting Blanchard's description provided by Officer Duke. Officer Toliver approached the pay phone and asked the man if he was Blanchard. Receiving a negative answer, Officer Toliver contacted Officer Duke informing him of the denial. The individual's identity as Blanchard was eventually confirmed via the license plate of the nearby vehicle. After Blanchard's identity was conclusively established, Officer Duke asked Officer Toliver over the open microphone on Officer Toliver's uniform to inquire on the whereabouts of Willeek's twin brother. Immediately Blanchard became very agitated and denied the existence of another child.

Based on Blanchard's responses, Officer Duke decided to join Officer Toliver in the parking lot. Focusing their attention on Blanchard's vehicle, they noticed Hughes asleep on the passenger seat of the locked vehicle. Hughes, feigning sleep, failed to be aroused even after an officer pushed up and down the car's bumper several times. Finally, the officers unlocked the car door with a lock-out tool. As Officer Toliver was helping Hughes out of the car, she whispered that she would talk if the officers moved her away from Blanchard.

Hughes was then transported to Wishard Hospital.

IPD Detective Kimberly McGivern (Detective McGivern) immediately met with Hughes in a private room at Wishard Hospital. Hughes held her hands in her lap, rocked back and forth, and stared. After she provided an oral statement to Detective McGivern in which she denied any knowledge about what had happened to Willon, Hughes was taken to a safe, undisclosed location. Later that day on July 7, 2001, Detective Scott Scheid (Detective Scheid) of the Marion County Sheriff's Department, obtained and executed a search warrant for Blanchard's car.

On July 8, 2001, between 2 p.m. and 3 p.m., Marie Commiskey (Commiskey), a registered nurse at Wishard Hospital, received a phone call from Blanchard seeking information about Willeek and Hughes. When Commiskey refused to divulge any detailed information, Blanchard became argumentative and threatened to kill her.

On July 9, Detective Scheid received a phone call from Blanchard inquiring about Hughes' location and the release of his car. On July 12, 2001, after the investigation stalled, Detective Sergeant Douglas Scheffel (Detective Scheffel) of the Marion County Sheriff's Department met with Hughes and asked her to write out her statement. Hughes complied and provided Detective Scheffel with the version she had given to Detective McGivern. As Detective Scheffel reviewed this statement with Hughes, she broke down and began to cry. Hughes then told Detective Scheffel what had actually happened to Willon. However, Hughes was unable to locate the exact area of Willon's grave in Boone County.

Based upon this new development, Detective Scheffel obtained a second search warrant for Blanchard's car. During the execution of the warrant, Detective Schef-

fel opened the trunk of the car. In the trunk, he found a muddy pair of boots, a spade with dirt on it, trash bags, a washcloth, and an Ace Bandage.

On July 18, 2001, the State filed an information in the Marion County Superior Court, charging Blanchard with Count I, murder, a felony, I.C. § 35–42–1–1, Count II, battery, a Class A felony, I.C. § 35–42–2–1, Count III, neglect, a Class B felony, I.C. § 35–46–1–4, Count IV, intimidation, a Class D felony, I.C. § 35–45–2–1, Count V, domestic battery, a Class A misdemeanor, I.C. § 35–42–2–1.3, and Count VI, battery, a Class A misdemeanor, I.C. § 35–42–2–1.

On July 31, 2001, Detective Scheffel received information that Blanchard was detained at the county jail in Cincinnati, Ohio. Together with Lieutenant Chris Heffner (Lieutenant Heffner), Detective Scheffel traveled to Cincinnati to return Blanchard to Indianapolis to be arrested. While waiting for Lieutenant Heffner to bring the car to the exit of the county jail, Blanchard initiated a conversation with Detective Scheffel indicating that he wanted to tell him what happened to Willon. After Detective Scheffel orally advised Blanchard of his rights, Blanchard admitted what had occurred and offered to aid the officers in locating Willon's body. Blanchard led the officers to the drainage ditch in Boone County where Willon's skeletal remains were found.

On August 3, 2001, the State filed amended charges on the same offenses. On August 24, 2001, Blanchard filed a Motion to Preserve Evidence seeking to have baby pictures seized from his car preserved. That same morning, the trial court granted the motion. On March 20, 2002, Blanchard filed a Motion for Severance of the charges. On April 12, 2002, the trial court only granted the motion regarding Counts V, domestic battery, and Count VI, battery, as they both related to Hughes.

On October 7, 2002, Blanchard moved to dismiss all charges based on the State's loss of the baby photographs, in violation of the trial court's Order to preserve them. On October 21, 2002, the trial court denied this motion.

On October 21 through October 24, 2002, a jury trial was held. On the morning of trial, the State filed a Motion to Permit the Belated Filing of the Habitual Offender Enhancement. After hearing argument, the trial court granted the State's motion. At the conclusion of the jury trial, the jury found Blanchard guilty of Count I, murder, Count II, battery, Count III, neglect, and adjudicated him to be a habitual offender. The trial court merged Counts I and II and entered judgment of conviction for Counts I and III. On December 6, 2002, during the sentencing hearing, the trial court sentenced Blanchard to a term of sixty-five years at the Department of Correction (DOC) for murder, enhanced to ninety-five years due to the habitual offender finding. The court imposed a twenty-year sentence for the conviction of neglect, to be served at the DOC. Additionally, the trial court ordered all sentences to run consecutively.

Blanchard now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Severance of Offenses

First, Blanchard argues that the trial court abused its discretion in denying his Motion to Sever. Specifically, Blanchard asserts that Count I and II relating to Willon should be severed from Count III, relating to Willeek, and that Count IV, relating to Commiskey, should be severed from the Counts relating to Willon or Willeek. Blanchard maintains that by allowing a jury trial on the joint offenses, he was prejudiced since the jury could not

distinguish the evidence relevant to each specific offense. Conversely, the State contends that the charges were properly joined because they were based on a series of acts which were connected together.

Indiana Code § 35–34–1–9(a) allows two or more offenses to be joined in the same charging document when the offenses are:

(1) of the same or similar character, even if not part of a single scheme or plan; or

(2) based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

When multiple offenses are contained in the same charging document, Indiana Code § 35–34–1–11(a) provides for the severance of the offenses as follows:

(a) Whenever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses. In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:

(1) the number of offenses charged;

(2) the complexity of the evidence to be offered; and

(3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

■ Thus, in interpreting these statutes, severance of offenses is a matter of right under subsection 11(a) only when the offenses are joined *solely* because they are of the same or similar character. Howev-er, if the State establishes that all offenses are sufficiently linked together, the matter of severance is to be determined by the trial court. Charges may be sufficiently linked together if they are connected by a distinctive nature, a common modus operandi linked the crimes, and that the same motive induced the criminal behavior. *See, e.g., Wilkerson v. State,* 728 N.E.2d 239, 246 (Ind.Ct.App.2000), *reh'g denied.*

Here, the crimes for which Blanchard was charged are sufficiently linked together. Willon and Willeek are Blanchard's twin sons. The record reflects that Blanchard was the primary caregiver for his sons: he decided when the infants would sleep, eat, and when their diapers would be changed. Blanchard admitted that he frequently placed a washcloth over the twins' mouths to muffle the crying so he could sleep.

The record further supports that Blanchard decided to change Willeek's diet after the formula gave him diarrhea. The record is devoid of any evidence that Blanchard ever sought medical care to treat Willeek's failure to gain weight. During Willeek's admittance to Wishard Hospital, Blanchard did not visit his son; rather he tried to elicit information on Willeek's health by placing a phone call to Commiskey. Commiskey testified that, when she refused to give him any details, Blanchard became belligerent.

Furthermore, the death of Willon was discovered during the investigation into the neglect of Willeek. Blanchard admitted that on the day of Willon's death, he had once again secured a washcloth with an Ace Bandage over the infant's mouth in an effort to cease his crying. Dr. Michael Clark (Clark), the forensic pathologist, ruled Willon's death to be a homicide caused by suffocation.

We find that the charges brought against Blanchard were not joined *solely* because they were of the same or similar character; rather, they were joined because of the series of acts connected together. *See* I.C. § 35–34–1–9(a). Based on the facts above, we determine there to be sufficient evidence of a distinctive nature, common modus operandi, and motive linking the charges. *See Wilkerson,* 728 N.E.2d at 246. Thus, severance was not mandated.

■ Accordingly, pursuant to section 11(a), severance becomes a matter within the trial court's discretion, taking into account: (1) the number of offenses charged; (2) the complexity of the evidence to be offered; and (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense. *See* I.C. § 35–34–1–11(a). A denial of severance will then only be reversed upon a showing of clear error. *See Conner v. State,* 580 N.E.2d 214, 219 (Ind. 1991), *cert. denied.*

In the instant case, Blanchard was charged with four offenses: two involving Willon, one involving Willeek, and one related to Commiskey. The evidence adduced at trial was predominantly police evidence recounting the investigation. The medical testimony elicited focused on Willon's ability to breath while crying and when a washcloth covered his mouth and on Willeek's failure to gain weight. Our review of the record further reveals that prior to presenting detailed testimony, the State clarified for the jury which victim the proposed testimony would relate to. Furthermore, the record reflects that the trial court instructed the jury to each count separately. Moreover, the fact that the jury could distinguish the evidence and apply the law is shown by their judgment: while the jury returned guilty verdicts on charges concerning the twins, they acquitted Blanchard of the intimidation charge against Commiskey.

Consequently, we conclude that even though the charges were joined, the jury could make a fair determination of Blanchard's guilt or innocence. *See* I.C. § 35–34–1–11(a). Therefore, the trial court did not abuse its discretion by denying Blanchard's motion for severance. *See id.*

## II. Loss of Evidence

■ Next, Blanchard contends that his due process rights were violated by the State's failure to preserve some twenty-seven photographs, portraying Willeek and Willon as happy and healthy infants. To support this contention, Blanchard maintains that these photos amounted to materially exculpatory evidence showing Willeek's ongoing physical condition immediately prior to entering the hospital. Conversely, the State asserts that the missing photographs were at most potentially useful evidence, the loss of which requires a showing of bad faith on the part of the police. Since Blanchard failed to establish bad faith, the State argues that his due process rights were not violated.

■ The appropriate test to apply when deciding whether a defendant's due process rights have been violated by the State's failure to preserve evidence depends on whether the evidence in question was "potentially useful evidence" or "material exculpatory evidence" as these terms were employed in *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281(1988).

■ Our United States Supreme Court has defined potentially useful evidence as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* As such, the State's failure to preserve the evidence does not constitute a

violation of due process rights unless the defendant shows bad faith on the part of the police. *See Chissell v. State*, 705 N.E.2d 501, 503 (Ind.Ct.App.1999), *trans. denied.* On the other hand, to rise to the level of material exculpatory evidence, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). When the evidence is defined as material exculpatory evidence, the State's good or bad faith in failing to preserve the evidence is irrelevant. *See Arizona*, 488 U.S. at 57, 109 S.Ct. 333.

In the case at hand, the lost evidence consisted of approximately twenty-seven photographs out of a batch of thirty, showing Willon and Willeek as healthy and happy infants. Detective Scheffel testified that he seized these photographs during the search of Blanchard's car. He clarified that, besides the three remaining photographs showing both twins, the other twenty-seven photographs all portrayed either Willon or Willeek with one of their parents. The record reflects that although in all these photographs Willon was heavier than Willeek, the twins did not appear undernourished.

Detective Scheffel further testified that after selecting three photographs to use at trial, he put the remaining twenty-seven photographs in a clear plastic shopping bag and placed them on top of the file, sitting on the floor next to his desk. He added that at some point the cleaning crew of his building took the bag with the photographs and discarded them. The record reflects that Blanchard entered the three remaining photographs into evidence, as Defendant's Exhibits F, G, and H.

Blanchard now asserts that the lost photographs are materially exculpatory evidence for his guilty conviction on Count III, neglect, because they would have shown a healthy and well-cared-for Willeek, as these particular photographs were taken only a few days or weeks before his arrest. Nonetheless, while a defendant is not required to prove conclusively that the destroyed evidence is exculpatory, there must be some indication that the evidence was exculpatory. *See Chissell*, 705 N.E.2d at 504. Furthermore, we cannot assume that the destroyed evidence contained exculpatory material when the record is devoid of such indication. *Id.* Although testimony established that all thirty photographs were similar in nature, Detective Scheffel did not know when exactly the photographs had been taken. Instead, Blanchard now requests us to speculate that the batch of missing photographs contained individual photos of Willeek, taken after the death of his twin brother. Furthermore, even assuming *arguendo,* that these photographs had been taken a few days before Blanchard's arrest, the fact remains that Willeek was chronically malnourished and anemic at the time he was admitted at Wishard Hospital. Therefore, we conclude that the lost evidence does not possess an exculpatory value which was apparent before its destruction; consequently, we find that the lost photographs do not rise to the level of materially exculpatory evidence. *See Trombetta*, 705 N.E.2d at 503.

Thus, at best, the missing photographs constitute potentially useful evidence. Consequently, we must determine whether Blanchard has established bad faith on the part of the State. *See id.* Bad faith is defined as being "not simply bad judgment or negligence, but rather implies the conscious doing of wrong be-

cause of dishonest purpose or moral obliquity." *See Samek v. State,* 688 N.E.2d 1286, 1289 (Ind.Ct.App.1997), *trans. denied.* Blanchard fails to carry this burden of proof. Our review of the record reflects that the loss of the photographs was nothing more than an inadvertent occurrence. Even though Detective Scheffel might be guilty of bad judgment by placing the photographs in a plastic shopping bag on the floor, his conduct did not amount to conscious wrongdoing. *See id.* The record further establishes that Detective Scheffel admitted to the error and took responsibility for it. Accordingly, we find that absent the showing of bad faith, Blanchard was not denied due process of law. *See Chissell,* 705 N.E.2d at 503.

### III. *Videotaped Statement*

Blanchard further contends that the trial court erred in admitting his videotaped statement. Specifically, Blanchard argues that (1) his contempt charge during a Child In Need of Services hearing (CHINS) on July 10, 2001, produced a chilling effect, such that his subsequent statement and waiver were tainted, (2) his statement derivatively obtained after his arrest was fruit of the poisonous tree and was made without the benefit of Miranda warnings, (3) the trial court erred by submitting his statement to the jury both in written and visual form simultaneously for the jury's consideration, (4) the trial court erred by denying the jury's request to view the videotaped statement again after deliberations had started, and (5) the trial court erred by not redacting portions of the statement prejudicial to him. Conversely, the State asserts that (1) Blanchard's argument fails to develop contentions on the repeated references to a CHINS hearing that is supported by adequate citation to the record; (2) Blanchard voluntarily and intelligently waived his Miranda rights, and (3) the trial court did not com-

mit reversible error when it provided the videotaped statement and the transcript to the jury.

### A. *CHINS Hearing*

■ Initially, Blanchard maintains that his contempt charge during a CHINS hearing on July 10, 2001, produced a chilling effect, such that his subsequent statement and waiver were tainted. In support of this allegation, Blanchard asserts that during a CHINS hearing on July 10, 2001, he was questioned about Willon's location. When he requested the aid of an attorney prior to answering the trial judge's questions, he was incarcerated for contempt. Because this contempt charge had a profound effect on him, Blanchard now argues that his subsequent statement and waiver are tainted as fruit of the poisonous tree.

We note at the outset that Appellant's Brief lacks any citations to the record or references to the Appendix supporting the imposition of the contempt charge. Our own review reveals that the record is completely devoid of any references to a CHINS hearing. Rather, the only evidence supporting his allegation is Blanchard's own Motion to Suppress Statements, as included in Appellant's Appendix p. 84, filed with the trial court on October 7, 2002. Our subsequent investigation of the Case Chronology shows that a hearing was held on this motion on October 16, 2002. The trial court took the motion under advisement. However, the Case Chronology is unclear regarding the ruling of the trial court.

We have repeatedly held that, on the points assigned as error, the appellant has the burden of presenting both a cognizable argument and the appropriate portions of the record to establish the error, as required by Ind. Appellate Rule 46(A)(8)(a). *See, e.g., Posey v. State,* 622 N.E.2d 1032, 1034 (Ind.Ct.App.1993), *trans. denied.* If

the appellant fails to do so, he waives a detailed consideration of those issues. *See id.* Accordingly, since Blanchard neglected to provide us with any evidence of a CHINS hearing, citations to the record, or supporting authority, we find Blanchard's argument waived.

### B. Blanchard's Statement

■ Blanchard further alleges that the trial court erred in admitting his statement given to Detective Scheffel while driving back from Cincinnati. Blanchard claims this statement was made without the benefit of his Miranda warning. On the other hand, the State maintains that Blanchard voluntarily and intelligently waived his rights. We agree with the State.

■ "When a defendant challenges the admissibility of his statement, the State must prove the voluntariness of the statement beyond a reasonable doubt." *Turner v. State,* 738 N.E.2d 660, 662 (Ind. 2000). The decision to admit a statement, following such a challenge, is left to the sound discretion of the trial court. *Id.* We will uphold the trial court's finding of voluntariness if the record discloses substantial evidence of probative value which supports the trial court's decision. *Id.* We do not reweigh the evidence and conflicting evidence is viewed most favorably to the trial court's ruling. *Id.* A statement is voluntary if, in light of the totality of the circumstances, the statement is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics which have overcome the defendant's free will. *See Ringo v. State,* 736 N.E.2d 1209, 1212 (Ind.2000). A signed waiver form is one item of evidence showing that the accused was aware of and understood his rights. *Id.*

The sequence of events at issue began when Detective Scheffel arrived in Cincinnati to return Blanchard to Indianapolis for the purpose of arresting him for Willon's murder. Detective Scheffel testified that, as he and Blanchard were waiting for the car, Blanchard initiated a conversation indicating that he wanted to divulge what had happened to Willon. Although Blanchard initiated the conversation, the record clearly shows that Detective Scheffel prevented Blanchard from saying anything until they were in the car and he had advised Blanchard orally of his constitutional rights. Detective Scheffel added that Blanchard appeared to understand these rights, that he voluntarily waived them, and that no threats or promises were made inducing Blanchard's statement.

Following Blanchard's statement, the officers took him to Boone County to recover Willon's remains. After the recovery and upon arriving at the Marion County Jail, the record indicates that Detective Scheffel took a taped statement of Blanchard. Detective Scheffel further testified that a written waiver was signed by Blanchard (State's Exhibit 39).

Viewing all these facts together, we hold that Blanchard voluntarily and knowingly waived his rights. *See Turner,* 738 N.E.2d at 662. Therefore, the trial court did not abuse its discretion by admitting his statement into evidence. *See id.*

### C. Statement and Transcript

■ Blanchard alleges that the trial court erred by submitting his statement to the jury both in written and visual form simultaneously for the jury's consideration. Particularly, he argues that the jury, while reading the transcript·of the videotaped statement, failed to observe Blanchard's demeanor, remorse, and denial of culpability, as evidenced in the videotape. Conversely, the State maintains that the trial court did not commit reversible error by admitting the transcript into evidence.

■ Our Supreme Court outlined the appropriate standard for the use of tran-

scripts of taped statements at trial in *Bryan v. State*, 450 N.E.2d 53 (Ind.1983). (*See also Roby v. State*, 742 N.E.2d 505, 507 (Ind.2001), *Tobar v. State*, 740 N.E.2d 106, 107 (Ind.2000)). Transcripts are usually needed only when portions of a tape are inaudible or speakers are difficult to identify, and they "should not ordinarily be admitted into evidence unless both sides stipulate to their accuracy and agree to their use as evidence." *Bryan*, 450 N.E.2d at 59 (quoting *United States v. McMillan*, 508 F.2d 101 (8th Cir.1974)). If a transcript is used as an aid, the trial court must instruct the jury that the transcript should not be given independent weight and that jurors are to "rely on what they hear rather than on what they read when there is a difference." *Id.* In *Bryan*, our supreme court concluded that the use of a transcript to assist jurors in understanding a recording that is played simultaneously is proper. *Id.* at 60.

Here, over Blanchard's objection, the trial court admitted the transcripts of his videotaped statement to Detective Scheffel. In doing so, the trial court admonished the jurors:

> Ladies and gentlemen of the [j]ury, State's 40, what has been described as the videotaped statement, this has been admitted as any other evidence in this case. You heard me use this expression regarding State's 49 "as an aid to the [j]ury." What that means is State's 49 has been admitted only for the purpose of aiding you as to when you review State's Exhibit 40. If there is a discrepancy between what you hear or see and what you read, you should rely on what you see and hear on the videotape versus what you read. Do you all understand my instruction in that regard?

(Transcript p. 578)

Despite these precautions, the admission of the transcript into evidence was error.

As our supreme court held in *Small v. State*, 736 N.E.2d 742, 748–49 (Ind.2000), because Blanchard did not explicitly agree to the admission of the transcript into evidence, it was error for the transcript to be admitted into evidence as an exhibit, as opposed to its use purely as an aid in understanding inaudible portions of the recorded statement. *See also Bryan*, 450 N.E.2d at 59.

■ However, whether this error requires reversal is another matter. An error in the admission of evidence "will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as to not affect the substantial rights of the parties." *Tobar*, 740 N.E.2d at 108 (quoting *Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995)). In this regard, Blanchard alleges that the jury may have been too busy reading the transcript to observe his demeanor and remorse. We find this claim without merit.

First, we note that the record is silent regarding the jury's actual use of the transcript. Thus, Blanchard's claim amounts to nothing more than speculation. Moreover, the admission of the transcript was cumulative to that of the actual videotape. Our supreme court has held before that the admission of evidence that is merely cumulative is not grounds for reversal. *See Sharp v. State*, 534 N.E.2d 708, 712–13 (Ind.1989), *cert. denied*. Thus, we conclude, that although the trial court erred in admitting the transcript as an exhibit over Blanchard's objection, we find this to be harmless error. *See Tobar*, 740 N.E.2d at 108.

### D. *Jury's Request to Review Evidence*

■ Next, Blanchard alleges that the trial court erred by denying the jury's

request to view the videotaped statement again after deliberations had started. Specifically, Blanchard claims that the trial court's decision prevented the jury from viewing Blanchard's explanation of his actions.

The correct procedure for answering questions raised by the jury after deliberations have begun is set forth in Indiana Code Section 34-1-21-6:

> After the jury has retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or their attorneys.

I.C. § 34-1-21-6. Here, the record reflects that the jury's request did not express a disagreement over their recollection, rather, the jury merely requested to be provided with the videotape and viewing equipment to review Blanchard's confession.

■ Thus, since the mandatory language of I.C. § 34-1-21-6 does not apply in this case, the decision to allow the jury to view the videotape again is within the discretion of the trial court. *Sturma v. State*, 683 N.E.2d 606, 609 (Ind.Ct.App. 1997); *Kiner v. State*, 643 N.E.2d 950, 955 (Ind.Ct.App.1994), *reh'g denied.* Prior to the start of jury deliberations, the trial court should consider three factors in deciding whether to permit the jury to take the particular exhibits with them to the jury room: (1) whether the material will aid the jury in a proper consideration of the case; (2) whether any party will be unduly prejudiced by submission of the material; and (3) whether the material may be subjected to improper use by the

jury. *See Thacker v. State*, 709 N.E.2d 3, 6 (Ind.1999), *reh'g denied.*

■ While the trial court has discretion in determining what the jury may take with it to the jury room at the beginning of deliberations, that discretion is somewhat more limited in the situation where the jury interrupts its deliberations to request material to review. *See Harris v. State*, 659 N.E.2d 522, 526 (Ind.1995); *Powell v. State*, 644 N.E.2d 855, n. 6 (Ind. 1994).

Our review of the record reveals that, after receiving the jury's request, the trial court summoned counsel to discuss an appropriate response. The trial court specifically asked Blanchard's counsel's views upon the proposed response of simply telling the jury to rely on their collective recollection of the evidence duly admitted during trial. Counsel expressly agreed that such a response was appropriate. Therefore, we find that Blanchard waived the error by agreeing to the court's proposed response. *See, e.g., State v. Chandler*, 673 N.E.2d 482, 484 (Ind.Ct.App. 1996) (where we held that Chandler invited error by agreeing to the proposed response to the jury to rely on their collective recollection). Accordingly, the trial court did not err in refusing the jury to review Blanchard's videotaped statement.

*E. Redaction of Videotaped Statement*

■ Lastly, Blanchard contends that the trial court erred by not redacting portions of the videotaped statement that were prejudicial to him. Although Blanchard raises this issue in the Statement of the Issues of his Brief, he nevertheless fails to make even the beginning of an analysis, let alone provide us with evidence, citations to the record, or supporting authorities. Thus, since Blanchard neglects to present a coherent argument and the appropriate portions of the record to establish the error, as required by Ind.

Appellate Rule 46(A)(8)(a), we find the issue waived.[1] *See, e.g., Posey,* 622 N.E.2d at 1034 (Ind.Ct.App.1993).

### IV. Jury Instructions

Blanchard next asserts that the trial court abused its discretion by giving Jury Final Instruction No. 10 in its original form. Particularly, Blanchard contends that the jury was misled since the instruction contained both the definition of intentional conduct and knowing conduct. Furthermore, Blanchard alleges that the trial court erred in refusing to clarify this Final Jury Instruction upon the jury's request after deliberations had started. Conversely, the State maintains that Blanchard's failure to object to the court's final instructions waived the issue for appeal. Further, the State argues that since Blanchard's counsel agreed to the proposed response to the jury's request for clarification, the issue is no longer open for appeal.

### A. Final Jury Instruction No. 10

Jury instructions are largely within the discretion of the trial court, and we will review a court's decisions on jury instructions only for an abuse of discretion. *See Scisney v. State,* 701 N.E.2d 847, 849 (Ind.1998). However, failure to make a timely objection to an instruction waives that issue for appellate review. *See id.* Although our review of the record reveals that Blanchard neither objected to the instruction, nor tendered an instruction of his own, in order to avoid waiver Blanchard now characterizes the trial court's tendering of Final Jury Instruction No. 10 as fundamental error.

A fundamental error is a substantial, blatant violation of the basic principles of due process that renders the trial unfair to the defendant. *See Stafford v. State,* 736 N.E.2d 326, 332 (Ind.Ct.App. 2000), *trans. denied.* Our supreme court has stressed that the fundamental error exception is "extremely narrow." *Mitchell v. State,* 726 N.E.2d 1228, 1236 (Ind.2000), *reh'g denied.* In order to qualify as fundamental error, "an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Id.* To justify reversal where an erroneous jury instruction was given, the error must be such that the whole charge of which it formed a part misled the jury concerning the law of the case. *Stafford,* 736 N.E.2d at 332.

Turning to the present case, Blanchard specifically alleges that Final Jury Instruction No. 10, containing both the definition for 'intent' and 'knowingly,' misled the jury in that the murder charge only referred to a knowing element. Final Jury Instruction No. 10 reads as follows:

> A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so.
>
> A person engages in conduct 'knowingly:' if, when he engages in the conduct, he is aware of a high probability that is doing so.
>
> You are instructed that if knowledge and intent, is an essential element to be proved herein, it may be inferred from the facts or circumstances as shown by the evidence.[2]

---

1. We strongly encourage Appellant's counsel to reacquaint himself with Ind. Appellate Rule 46(A)(8)(a).

2. We would note that the use of the conjunctive "and" with regard to "knowledge and intent" is susceptible to misinterpretation by the jury as to the murder charge. However, because proof of an intentional killing is a more stringent test than that of "knowing" conduct, the error, if any, was to Blanchard's benefit.

(Appellant's App. p. 101). The murder charge, as referenced in Final Jury Instruction No. 1, is defined as:

A person who knowingly kills another human being commits MURDER, A FELONY.

The elements of this offense are that the Defendant must:

1. Knowingly
2. Kill
3. Another Human Being

(Appellant's App. p. 100)

■ We note at the outset that, generally, the use of a term of art in a jury instruction requires a further instruction explaining the legal definition of the word. *See Abercrombie v. State*, 478 N.E.2d 1236, 1239 (Ind.1985). The record clearly indicates that, although the State initially objected to the inclusion of the intent definition, the trial court explained that since Count IV, intimidation, and some of the lesser included offenses contained an intent element, the jury had to be instructed on the intent definition.[3]

Blanchard further refers to *Clark v. State*, 728 N.E.2d 880 (Ind.Ct.App.2000), *trans. denied*, standing for the proposition that the Final Jury Instruction No. 10 should have emphasized the intentional rather than merely the knowing element of the murder charge. Nevertheless *Clark* is not applicable here. *Clark* involves a child molestation case in which the trial court refused to give Clark's proffered instruction including the specific mens rea element for the charged offense. We held that since the charge of child molestation contained a mens rea requirement for acts of deviate sexual misconduct, the trial court's failure to include this element in its jury instructions amounted to an incorrect

statement of the law. As such, reversal was mandated in *Clark*.

In the instant case, however, we not only have a claim of fundamental error but the offense at issue is a murder charge. Our supreme court has previously held that a mens rea of either knowledge or intent is an essential element constituting the crime of murder in Indiana. *See, e.g., Vance v. State*, 620 N.E.2d 687, 690 (Ind.1993). As a result, Blanchard can be charged with only a knowing killing. *See Anderson v. State*, 681 N.E.2d 703, 707 (Ind.1997).

Thus, we conclude that the tender of Final Jury Instruction No. 10 did not amount to a fundamental error. It was well within the province of the State to define the crime of murder by using the knowing element rather than intent. Furthermore, since Count IV and the lesser included offenses, on which the jury was instructed, included an intent element, a jury instruction explaining its legal definition was required. *See Abercrombie*, 478 N.E.2d at 1239. Therefore, we find that the jury instructions, taken as a whole, did not misstate the law or serve to confuse the jury. *See Stafford*, 736 N.E.2d at 332. Consequently, Blanchard's rights were not prejudiced and no reversal is warranted. *See Mitchell*, 726 N.E.2d at 1236.

B. *Jury's Request for Clarification*

■ Next, Blanchard contends that the trial court erred by refusing to clarify Final Jury Instruction No. 10 upon the jury's request after deliberations had started. As we noted above, where counsel agrees to a proposed response to a jury's question, the issue is waived for appellate review. *See Chandler*, 673 N.E.2d at 484. The record supports that the jury requested a clarification on Final Jury Instruction No. 10 in conjunction

---

**3.** Although Appellant's Appendix does not include all Final Jury Instructions, the record

specifies the reason for including the intent definition. (*See* Transcript p. 737).

with the Final Jury Instruction regarding murder. After consulting with Blanchard and the State, both parties accepted the trial court's proposed response. Thus, since Blanchard expressly agreed to the appropriateness of the response, error is waived. *See id.*

### V. Ineffective Assistance of Counsel

Blanchard further asserts that he received ineffective assistance of trial counsel. In particular, he maintains that his trial counsel was ineffective because (1) he did not elicit testimony from Detective Scheffel concerning his opinion of Blanchard's guilt; (2) he failed to redact a portion of Blanchard's statement; (3) he neglected to address Blanchard's lack of motive; (4) he only used twenty-one minutes of the allotted forty-five minutes during closing argument; (5) he failed to object to the State's prejudicial and speculative statements in his closing argument; (6) he failed to sever the charges; and (7) he failed to properly cross-examine Zalikah Fuller (Fuller) during the habitual offender phase of the trial.

### A. Standard of Review

The standard by which we review claims of ineffective assistance of counsel is well established. In order to prevail on a claim of this nature, a defendant must satisfy a two-pronged test: (1) a showing that his counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms, and (2) a showing that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Troutman v. State,* 730 N.E.2d 149, 154 (Ind.2000) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g. denied* ).

■■■■ However, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Saylor v. State,* 765 N.E.2d 535, 549 (Ind. 2002). Consequently, isolated poor strategy or bad tactics do not necessarily amount to ineffective assistance of counsel unless, taken as a whole, the defense was inadequate. *Brown v. State,* 698 N.E.2d 1132, 1139 (Ind.1998), *reh'g denied.* Furthermore, we "will not speculate as to what may or may not have been advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State,* 696 N.E.2d 40, 42 (Ind.1998).

### B. Opinion Testimony

■■■ Blanchard first claims that his trial counsel was ineffective for failing to elicit opinion testimony from Detective Scheffel. Specifically, he alleges that his counsel failed to proffer into the record Detective Scheffel's testimony given during the bail hearing of February 22, 2002. At this bail hearing the Detective testified that he discussed the possibility of lesser included offenses with Blanchard and added that "it was up to the Prosecutor's Office, but [Blanchard] could be looking at something less than murder." (Tr. p. 192).

■■■ Although Ind. Evidence Rule 701 and 702 allow opinion testimony by lay witnesses and experts, Evid. R. 704(b) clearly stipulates that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case." No witness, whether lay or expert, is competent to testify that another witness is or is not telling the truth. *See Shepherd v. State,* 538 N.E.2d 242, 243 (Ind.1989). Such testimony is highly improper and invades the province of the jury in determining what weight to place on a witness' testimony. *Head v. State,* 519 N.E.2d 151, 152 (Ind. 1988).

ment should have been redacted under Evid. R. 104(b).[4] We disagree.

Detective Scheffel's own opinion that Blanchard's actions might be something less than murder, constituted, in effect, a declaration of Blanchard's innocence for murder. Therefore, the statement would have been inadmissible at trial under Evid. R. 704(b). As a consequence, Blanchard fails to show that, even if his counsel would have proffered Detective Scheffel's opinion at trial, the trial court would have admitted his testimony. *See Troutman*, 730 N.E.2d at 154. Thus, in this regard Blanchard's claim of ineffective assistance of counsel fails.

### C. *Redaction of Blanchard's Statement*

■ As part of his ineffective assistance of counsel claim, Blanchard wishes us to consider his argument made in the sufficiency of evidence section of his brief, namely, that his trial counsel failed to redact a prejudicial portion of Blanchard's confession. In his videotaped statement, Blanchard admitted telling Hughes that he had to stop tying a washcloth to the twins' mouths because "[he] knew that something could possibly, eventually happen when [he] did it." (State's Exhibit 49, p. 4). Now Blanchard contends that the trial court should have redacted the statement as being prejudicial to him.

It is well established that to prove his claim of ineffective assistance of counsel, Blanchard must demonstrate that the trial court would have sustained a proper objection to the now-challenged statement. *See, e.g., Oglesby v. State*, 515 N.E.2d 1082, 1084 (Ind.1987); *Glotzbach v. State*, 783 N.E.2d 1221, 1225 (Ind.Ct.App.2003). Blanchard supports his allegation by claiming that the fact that *something eventually could happen* is too speculative to support the knowing element of the murder charge. As such, the particular state-

ment should have been redacted under Evid. R. 104(b).[4] We disagree.

Evid. R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Blanchard's statement that he was aware that something could possibly happen is important to establish the knowing element of the murder charge. I.C. § 35–41–2–2 stipulates that "a person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Thus, Blanchard's statement is directly relevant to support his awareness of possible injury or death which could result from placing a washcloth over the infants' mouths. Therefore, we find that the statement has the tendency to demonstrate that Blanchard knowingly killed Willon more than it would be without the statement. *See* Evid. R. 401. Consequently, the trial court would not have sustained Blanchard's objection to his statement. *See Oglesby*, 515 N.E.2d at 1084. Accordingly, Blanchard's allegation of ineffective assistance of counsel fails.

### D. *Lack of Motive*

■ Further, Blanchard asserts that his trial counsel's assistance was ineffective because he failed to address Blanchard's lack of motive. Even though Blanchard concedes that motive is not an element of a crime, he nevertheless argues that trial counsel's failure to reference the issue of motive during closing argument was improper. We disagree. Here, the conduct of Blanchard's trial counsel was squarely based on his professional training and experience. As we noted above, coun-

---

4. Evid. R. 104(b) stipulates that "[w]hen the relevancy of the evidence depends upon the fulfillment of a condition of fact, the [c]ourt shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

sel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. *See Whitener*, 696 N.E.2d at 42. As a result, we find that Blanchard's trial counsel's decision not to address the possible lack of motive a matter of trial strategy, which this court refuses to second-guess.

### E. Length of Closing Argument

 Next, Blanchard alleges that trial counsel's failure to use the entire time allotted for closing argument rises to ineffective assistance of counsel. In particular, he claims that instead of merely using twenty-one minutes out of the allotted forty-five minutes, trial counsel should have used his remaining time to "hammer home" the issue of insufficient evidence. (Appellant's Brief p. 27). Our review of the record establishes that during his closing argument, trial counsel attempted to attack the weaker parts of the State's case, he advised the jury to consider the lesser included charges, and revisited Blanchard's confession and the relevant facts. Again, we will not speculate about what may be the most advantageous strategy in particular cases. A deliberate choice made by trial counsel for some tactical or strategic reason does not establish ineffective assistance of counsel. *See id.* Moreover, the decision to forego part of the time allotted during closing argument is within the realm of reasonable trial strategy; a decision which we will accord deference. *See id.* Accordingly, we conclude that Blanchard did not show that his trial counsel's performance fell below an objective standard of reasonableness. *See Troutman*, 730 N.E.2d at 154.

### F. State's Closing Remarks

 Blanchard further argues that trial counsel was ineffective since he failed to object to the State's prejudicial and speculative statements during rebuttal argument. Specifically, he asserts that the State's comments mischaracterized the testimony of Dr. John Heidingsfelder (Dr. Heidingsfelder).

Dr. Heidingsfelder testified that a five-month-old baby breathes primarily through the nose. He clarified that if a washcloth is placed over the mouth, leaving the nose uncovered, the infant would still be able to breathe. During the State's cross-examination, Dr. Heidingsfelder elaborated that if a baby moves around, the cloth on its mouth could block the child's nose.

Blanchard now insists that his counsel performed deficiently for failing to object to the State's comments, which were unsupported by probative expert testimony. In his argument, the State commented:

> There's only one consequence that's going to happen when you put a cloth and tie it over the mouth of a child. The child is going to die. . . . And when that cloth was placed over the mouth, even if it was only the mouth, the child is still going to move and the child is going to have his face move around and that cloth is going to work up over the nose and the child is going to suffocate and the child is going to die.

(Tr. p. 778, 779).

Our supreme court has previously held that trial counsel can reasonably decide that objecting to the State's comments, interspersed at different places in the argument, would draw undue attention to them. *See Saylor v. State*, 765 N.E.2d 535, 551 (Ind.2002), *cert. denied.* As such, Blanchard's trial counsel decision to remain seated at that time is a reasonable strategic decision which does not constitute ineffective assistance of counsel. *See id.*

Furthermore, even if trial counsel would have objected, his objection would most likely have failed. In *Hobson v. State,* 675 N.E.2d 1090, 1096 (Ind.1996), our supreme court held that a prosecutor's final argument may "state and discuss the evidence and reasonable inferences derivable therefrom so long as there is no implication of personal knowledge that is independent of the evidence." *Id.* Here, Dr. Heidingsfelder testimony clearly served as the basis for the reasonable inference drawn by the State during closing argument. Accordingly, the State remained well within the bounds of permissible closing argument. Therefore, we find again that Blanchard failed to show that his trial counsel's conduct fell below an objective standard of reasonableness. *See Troutman,* 730 N.E.2d at 154.

### G. Severance of the Charges

■ In support of this contention, Blanchard incorporated the argument from his "Argument # 2." (Appellant's Brief p. 25). However, our review of Argument # 2 does not reveal any claim of ineffective assistance of counsel. Again, since Blanchard neglects to present an independent argument and the appropriate portions of the record to establish the error, as required by Ind. Appellate Rule 46(A)(8)(a), we find the issue waived. *See Posey,* 622 N.E.2d at 1034 (Ind.Ct.App. 1993).

### H. Failure to Cross–Examine

■ Lastly, Blanchard asserts that his trial counsel's assistance was ineffective since he failed to challenge Fuller's credentials by way of preliminary questions. Fuller is IPD's Identification Processor and fingerprint examiner. She testified that she had two years of experience and had received forty hours of training by IPD instructors.

During Fuller's testimony, the State established the procedure for thumbprint comparison, and the results of her examination. At trial, Blanchard offered no showing that Fuller was less than precise in her testing and observations, in fact, Blanchard did not object to any elicited testimony, nor did he cross-examine Fuller. Our supreme court has observed that it is not unreasonable for an experienced trial lawyer to refrain from presenting additional evidence through testimony. *See Troutman,* 730 N.E.2d at 154. Therefore, we refrain from second-guessing trial counsel's strategic decision and hold that Blanchard did not establish that his trial counsel's performance fell below an objective standard of reasonable care. *Id.*

### VI. Sufficiency of the Evidence

Blanchard next contends that the evidence presented at trial was insufficient to support his murder conviction. Particularly, Blanchard maintains that the State did not prove beyond a reasonable doubt that he knowingly killed Willon. Additionally, Blanchard alleges that the trial court abused its discretion by refusing to act as a thirteenth juror and grant a new trial *sua sponte.*

### A. Standard of Review

■ Our standard of review for a sufficiency of the evidence claim is well-settled. In reviewing sufficiency of the evidence claims, we will not reweigh the evidence or assess the credibility of the witnesses. *Cox v. State,* 774 N.E.2d 1025, 1028–29 (Ind.Ct.App.2002). We will consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Alspach v. State,* 755 N.E.2d 209, 210 (Ind.Ct.App.2001), *trans. denied.* The conviction will be affirmed if there is substantial evidence of probative value to support the conviction of the trier-of-fact. *Cox,* 774 N.E.2d at 1028–29. A verdict will

be sustained based on circumstantial evidence alone if the circumstantial evidence supports a reasonable inference of guilt. *Maul v. State,* 731 N.E.2d 438, 439 (Ind. 2000).

Murder is defined by I.C. § 35–42–1–1, in pertinent part, as: "[a] person who knowingly ... kills another human being ... commits murder, a felony." Knowingly is defined as: "[a] person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35–41–2–2.

### B. *Sufficiency of the Evidence for Murder Charge*

▪▪▪▪ Blanchard first asserts that the State did not prove, beyond a reasonable doubt that he is guilty of his son's murder. To convict Blanchard of murder, the State is required to prove that Blanchard was aware of the high probability of killing Willon by placing a washcloth over his mouth. *See* I.C. § 35–42–1–1, § 35–41–2–2. In deciding whether Blanchard was aware of the high probability that his actions would result in Willon's death, the jury may consider the duration and brutality of his actions and the relative strengths and sizes of Blanchard and Willon. *See Williams v. State,* 749 N.E.2d 1139, 1141 (Ind.2001); *Childers v. State,* 719 N.E.2d 1227, 1229 (Ind.1999); *Lush v. State,* 783 N.E.2d 1191, 1196 (Ind.Ct.App.2003).

In the present case, Blanchard was the primary caregiver for the twins. Hughes testified that he decided when the infants would eat, sleep, and when their diaper would be changed. Blanchard admitted that he used to muffle the babies' crying by placing a washcloth over their mouths. He confessed that he especially tended to do this at night, so that he could get some sleep. Blanchard admitted that "[he] was going to stop doing it because [he] knew that something could possibly eventually

happen when [he] did it." (State's Exhibit 49, p. 4).

In his statement to Detective Scheffel, Blanchard testified that on the night Willon died, Willon was crying excessively. Blanchard explained that he became upset and declared that he would "shut him up." (Tr. p. 616). As he had done before, Blanchard used an Ace Bandage to tie a twice-folded washcloth across Willon's mouth. Blanchard stated that he did not remove the cloth for approximately two hours.

Blanchard relies on Dr. Merck's medical testimony stating that babies are obligate nose breathers up until three to five months. This testimony was corroborated by Dr. Heidingsfelder. Nonetheless, whereas both expert witnesses agreed that babies can breath through their mouth when crying, Dr. Heidingsfelder clearly elaborated that "children who are crying are inhaling and exhaling oxygen through their mouth." (Tr. p. 762).

Blanchard further insisted that Hughes had never challenged him about using the washcloth. However, the evidence supports that Hughes' life was entirely dominated by Blanchard; she was too afraid to do anything. Hughes testified that Blanchard forced her to leave the hospital eight hours after giving birth to the twins because "it was too noisy and people were a problem." (Tr. p. 603–04). She added that Blanchard decided to name the boys after himself. He further decided when she would eat and sleep. Moreover, Hughes explained that Blanchard determined how to hold the children and care for them. She and the twins were not allowed to stay in the hotel while Blanchard was at work; instead they all had to accompany Blanchard. Hughes explained that while in the car, she was not allowed to look out the window, rather, Blanchard

insisted that she look down because she already "had a man." (Tr. p. 609).

Based on the record and the testimony of witnesses, we conclude that the evidence was sufficient to find Blanchard guilty of Willon's murder. Expert testimony clearly established that a crying infant inhales through his mouth. Thus, by covering Willon's mouth with a twice-folded washcloth, Blanchard stifled his airway and prevented him from breathing. The five-month-old boy was too young to remove the Ace Bandage himself. Furthermore, Blanchard, through his own confession, admitted that he was aware of the possible dangers of using a washcloth. Consequently, we find that there is substantial evidence of probative value to support the conviction of the trier of fact. *See Cox,* 774 N.E.2d at 1028–29.

### C. *Abuse of Discretion*

Blanchard further contends that the trial court abused its discretion by refusing to act as a thirteenth juror and grant a new trial *sua sponte.* Specifically, Blanchard asserts that ruling upon his motion to correct errors, filed January 3, 2003, the trial court improperly denied his request for a new trial.

When ruling on a motion to correct error where the request is for a new trial, the trial court acts as a thirteenth juror, and as such, may weigh the evidence and judge the witnesses' credibility. *See State v. Kleman,* 503 N.E.2d 895, 896 (Ind.1987). The court may order a new trial if it determines that the verdict is against the weight of the evidence. *See* Ind. Trial Rule 59(J)(7). Upon reviewing a trial court's ruling on motion for new trial, an appellate court is to examine the record to determine whether: (a) the trial court abused its judicial discretion, (b) a flagrant injustice has been done to the appellant, or (c) a very strong case for relief from the trial court's ordering a new trial has been made by the appellant. *See Jones v. State,* 697 N.E.2d 57, 59 (Ind.1998).

We agree with the State that none of these situations exist in the present case. As noted above, the evidence was sufficient to convict Blanchard of Willon's murder. Accordingly, we find neither an abuse of discretion, a flagrant injustice, nor a strong case for the relief sought. Therefore, we decline to reverse the trial court's refusal to grant a new trial.

### VII. *Belated Filing of the Habitual Offender Enhancement*

Lastly, Blanchard asserts that the trial court abused its discretion by granting the State's motion to file a belated habitual offender information. In particular, Blanchard maintains that the filing of the habitual offender information on the day of trial prejudiced his rights. The State counters that Blanchard's failure to seek a continuance once the court allowed the new charge, resulted in waiver and alternatively, that the State met its burden of showing good cause for the belated charge.

Generally, an amendment of an indictment or information to include an habitual offender charge under I.C. § 35–50–2–8 must be made no later than ten days after the omnibus date. *See* I.C. § 35–34–1–5(e). Upon a showing of good cause, however, the trial court may permit the filing of an habitual offender charge at any time before the commencement of trial. *See id.* It is well established that once a trial court permits the tardy habitual offender filing, an appellant must move for a continuance in order to preserve the propriety of the trial court's order for appeal. *See Williams v. State,* 735 N.E.2d 785, 789 (Ind.2000); *Mitchell v. State,* 712 N.E.2d 1050, 1053 (Ind.Ct.App.1999). In the present case, the State filed the habitual offender charge on October 21, 2002,

thirteen months after the omnibus date. Our review of the record shows that Blanchard did not move for a continuance; thus the issue is waived.

Waiver notwithstanding, we find that the trial court properly permitted the belated filing of the habitual offender charge. The record reflects that on the day of trial, the State explained that it believed the habitual offender information had been filed on September 12, 2001. The State further noted that although a copy of this information had been provided to Blanchard on the same day, the trial court's file lacked the date stamped original of the charge. After Blanchard's trial counsel acknowledged that he had received this information in the past, he affirmatively stated that the habitual offender charge the State sought to file with the trial court on the day of trial, was the "same as the information" he had. (Tr. p. 291).

As a result, we conclude that Blanchard's rights were not prejudiced by the tardy filing of the habitual offender enhancement. The record clearly establishes that Blanchard's trial counsel had been aware of the charge and was fully prepared for trial. The only mishap appeared to be the official filing of the charge with the trial court. In light of the State's explanation, we find that the trial court was justified in finding good cause, and allowing the belated filing of the habitual offender charge. *See* I.C. § 35–34–1–5(e). Thus, the trial court did not abuse its discretion.

### CONCLUSION

Based on the foregoing, we find that (1) the trial court did not abuse its discretion by denying Blanchard's Motion to Sever Counts involving each of his twin sons; (2) the loss of photographs, portraying the twin boys as happy and healthy, does not warrant a reversal of Blanchard's convic-

tion for Count III, neglect; (3) the trial court did not abuse its discretion by admitting Blanchard's videotaped statement into evidence; (4) the trial court did not abuse its discretion by giving Final Jury Instruction No. 10 in its original form; (5) Blanchard did not receive ineffective assistance of trial counsel; (6) the State presented sufficient evidence to sustain Blanchard's conviction for Count I, murder; and (7) the trial court did not abuse its discretion by allowing the State to file a belated habitual offender enhancement on the day of trial.

Affirmed.

SULLIVAN, J., and FRIEDLANDER, J., concur.