# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 21 2017, 6:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Oliver Younge
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Christopher Schafer,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 21, 2017

Court of Appeals Case No.
49A04-1605-CR-1143

Appeal from the Marion Superior Court

The Honorable Grant W. Hawkins, Judge

Trial Court Cause No.
49G05-1409-MR-42291

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Christopher Schafer (Schafer), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1); and battery with death of a person less than fourteen, a Level 2 felony, I.C. § 35-42-2-1(b)(1).

We affirm.

# ISSUES

Schafer raises seven issues on appeal, which we consolidate and restate as the following six issues:

(1) Whether the trial court disclosed bias and a lack of impartiality when making certain statements during the proceedings;

(2) Whether the trial court abused its discretion by admitting Schafer's statements to the police officers into evidence;

(3) Whether the trial court abused its discretion by admitting certain evidence of prior misconduct pursuant to Indiana Rules of Evidence 404(b);

(4) Whether the trial court abused its discretion by admitting Schafer's jail phone call to his mother into evidence;

(5) Whether the State failed to preserve certain materially exculpatory evidence; and

(6) Whether the State presented sufficient evidence beyond a reasonable doubt to support Schafer's conviction for murder and battery with death of a person less than fourteen.

# FACTS AND PROCEDURAL HISTORY

[4] On September 2, 2014, Schafer and Skye Johnson (Johnson) lived in Indianapolis, Indiana, with their ten-week old daughter, G.S., and Johnson's two children from a previous relationship, two-year old K.G. and one-year-old J.G. Johnson watched the children during the day and worked evening shifts at a local restaurant, while Schafer worked opposite shifts.

[5] On August 29, 2014, Johnson took G.S. to the hospital where a CT scan was taken. G.S. was diagnosed with acid reflux disease. While she was not prescribed any medication, Johnson received suggestions of alternate ways of feeding G.S. to help with her acid reflux. The hospital personnel also noted a bruise on G.S.'s eyebrow and Johnson spoke with a social worker. Johnson explained that the bruise was the result of being hit with a plastic block by J.G.

[6] On September 2, 2014, Johnson's friend, Aaron Hawkins (Hawkins), visited the apartment and brought lunch for the family. Hawkins did not observe any injuries on G.S. when he left at 1:00 p.m. During the afternoon, Johnson breastfed G.S. at 1:00 p.m. and again at 4:00 p.m., right before she left for work. Schafer arrived home from work at 4:15 p.m. and, at that time, G.S. was asleep in the swing in the living room. At approximately 8:45 p.m., Johnson began receiving text messages from Schafer, expressing his growing frustration with G.S. because he had problems feeding her. Johnson suggested different ideas on how to feed her, and around 10:30 p.m. Schafer let her know that G.S. was eating.

[7] Johnson finished her shift around midnight but lingered with co-workers in the parking lot for about thirty to forty-five minutes before driving home, ignoring several phone calls from Schafer. When she was on her way home, she accepted a call from Schafer, who informed her that G.S. was "unresponsive" and "he didn't know what to do." (Transcript p. 143). Johnson advised Schafer to call 911. When she arrived home, the police were not yet there. As she ran inside the apartment, Schafer was on the phone with the paramedics who were giving him instructions on performing CPR. G.S. was on the counter on the right side of the stove, and noticing "the color of skin, [Johnson] knew [G.S.] had passed away." (Tr. p. 145). Johnson ran back outside to wait for the police and paramedics to arrive.

[8] When the police and paramedics arrived, Schafer and Johnson were advised to wait outside. Schafer told Johnson that he "had gotten [G.S.] to fall asleep on his chest while he was laying on the couch." (Tr. p. 146). Because he didn't want to disturb G.S. by getting up, he ended up falling asleep on the couch too. When Schafer woke up, he found G.S. "squished in between him and the back of the couch." (Tr. p. 146). Schafer told Johnson that G.S. "was convulsing trying to get air" and "he tried to get [G.S] to start breathing." (Tr. pp. 147, 146). The paramedics attempted CPR and ventilations on G.S. in the ambulance after removing some of her clothing. G.S. had bruising around her eyes, nose, chest and "yellowish, blue bruising to the left side of her head." (Tr. p. 118). G.S. was transported to Community North Hospital, where she arrived in cardiac arrest. Attempts to restart her heart failed and she was pronounced

dead at 1:47 a.m. on September 3, 2014. Dr. Paula Wilham (Dr. Wilham), the receiving physician when G.S. was brought into the emergency room, was concerned about the bruising on G.S.'s neck and chest because a child that age cannot roll over or sit up and can barely hold her head up for short periods of time. G.S. had old as well as new bruising on her head and back, petechiae under her eyes, bilateral subdural hemorrhages, brain swelling, and a fractured femur. With these injuries, G.S. would have cried inconsolably, "because that would be her only way of communicating that something was wrong." (Tr. pp. 183-84). At the hospital, Indianapolis Metropolitan Police Detective Douglas Cook (Detective Cook) was informed by Dr. Wilham and the Deputy Coroner about the extent of G.S.'s injuries.

[9] While G.S. was transported to the hospital, Johnson and Schafer were interviewed by Indianapolis Metropolitan Police Detectives. Schafer's interview took place inside Detective Brian Schemenaur's (Detective Schemenaur) police vehicle and was recorded. At that point, Detective Schemenaur was unaware of the extent of G.S.'s injuries. Schafer informed Detective Schemenaur that G.S.'s health was "fine" when he arrived home that afternoon and that G.S. was asleep in the swing after being breastfed by Johnson. (Tr. p. 257). He advised the Detective that J.G. had hit G.S. in the face with a small plastic toy bird, "causing a small cut or laceration above the lip area." (Tr. p. 258). He then described the couch incident where he had fallen asleep and then awoken to find G.S. "pinned face first into the couch between his body and the couch." (Tr. p. 259).

[10]    After the interview ended, Detective Schemenaur received "information from Detective Cook that led [him] to believe that [Schafer] was not telling the truth." (Tr. p. 260). At that point, "the nature of the investigation took a different course" and it became necessary to transport the parents down to the homicide office were "an audio and video recorded statement following them both being mirandized and done in a formal setting" could occur. (Tr. p. 260). Before the interviews took place, both Schafer and Johnson were tested for fifteen different types of drugs and were found to be negative for all tested substances.

[11]    During the second interview at the police station, Schafer was read his *Miranda* rights, and he signed a waiver form. When confronted with the extent of G.S.'s injuries by Detective Cook and Dr. Wilham's opinion that these could not have been sustained by a rollover, Schafer's explanation changed. Schafer told the detectives that he had been "laying down horizontally" on the couch, with his head resting on a pillow. (Appellant's App. p. 55). G.S. was on his chest, facing up, and had fallen asleep on her back. (Appellant's App. p. 55). When Schafer woke up, his "body pressed up against her, with her head facing towards the back of the chair." (Appellant's App. p. 56). "She was gasping for air at the time, but it was almost like a really week gasp" and her "[e]yelids were blue." (Appellant's App. p. 56). Schafer took G.S. into the kitchen where he placed her on the counter and then went to "grab [his] phone." (Appellant's App. p. 80). Not being able to find his phone, Schafer thought that it might have fallen down the cushions of the couch. He "went to go look for it and it

took [him] a little longer than [] expected." (Appellant's App. p. 80). When he returned to the kitchen, G.S. was laying face down on the kitchen floor. Later during the interview, Schafer added that when he woke up on the couch, he shook G.S. from side to side. He also mentioned shaking G.S. after she had fallen off the kitchen counter. Then, he changed his story again, telling the Detectives that he never shook G.S. A little while later, Schafer explained that he had been trying to feed G.S. and he got "frustrated." (Appellant's App. p. 108). "[He] would get frustrated really bad because [he] want her to eat because if she doesn't eat, she'd get sick." (Appellant's App. p. 108). After Schafer woke up on the couch, G.S was crying, but it was more "a whimper or something." (Appellant's App. p. 111). He "tried to feed her again what was left. And she wouldn't eat it." (Appellant's App. p. 111). And he "was dealing with this all night. [He] got really upset and [he] got really frustrated." (Appellant's App. p. 112). He admitted that G.S. never became "wedged between [him] and the couch cushion." (Appellant's App. p. 112). He explained that when he stood up from the couch, G.S. was in his lap. He put his weight on the baby—"like crushed her" and "wedged [her] underneath" him. (Appellant's App. p. 113). G.S. "was gasping for air [] but it was [] weak." (Appellant's App. p. 114). Schafer picked her up and G.S. started bleeding out of her nose.

[12]     On September 3, 2014, the State filed an Information, charging Schafer with Count I, murder, a felony; Count II, neglect of a dependent, a Level 1 felony; and Count III, battery with death of a person less than fourteen, a Level 2

felony. On March 11, 2016, Schafer waived his right to a jury trial. Six days before trial, Schafer called his mother from jail, using another inmate's PIN. During the conversation,[1] Schafer's mother gave him "a fourth version of what could have happened. That blames and tries to pin [Johnson] coming home at 11:30 at night while Schafer is asleep on the couch, causing all these injuries to G.S., putting [G.S.] back on his chest so he can wake up to her at 12:30 and that [Johnson] then disappears." (Tr. p. 283). Schafer replied that he "wish[ed] [he] would have thought of this earlier." (Tr. p. 283).

[13] On April 18, 2016, the trial court conducted a bench trial. During the trial, forensic pathologist Dr. Thomas Sozio (Dr. Sozio) testified about the autopsy he had performed on G.S. He determined that G.S. had sustained "multiple areas of blunt force trauma, meaning contusions and bleeding, around the face." (Tr. p. 307). He also observed a torn frenulum, which is "that area of skin [] that is attaching the lip to the gum," and which could have been caused by "[f]orceful penetration with a bottle." (Tr. p. 311). "It's usually always seen with a child abuse case." (Tr. p. 311). On her left chest, G.S. had injuries that could not have been caused by CPR, but had to have been caused by blunt force trauma. Dr. Sozio also testified to G.S.'s femur fracture, which he described as a spiral fracture, caused by a twisting external force, and which would have resulted in "extreme pain, crying profusely, [and] not eating." (Tr p. 315). Dr.

---

[1] A summary of this conversation was presented by the State during trial. Schafer agreed that this was "a fair summary" and the trial court accepted the synopsis into the record as a summation of the content of the conversation. (Tr. p. 283).

Sozio opined that G.S.'s skull was not fractured, but there was subdural and subarachnoid hemorrhage underneath the skull, which had been caused by "any type of shaking injury." (Tr. p. 319). G.S.'s brain had undergone "severe swelling" to the point her brain "was forcibly [] protruding through any orifice or hole that it could find []—in this case, the spinal cord." (Tr. p. 319). Immediately after the brain injury, G.S. would have experienced "a loss of consciousness, not able to eat, [] maybe projectile vomiting, [and] problems breathing." (Tr. p. 320). She would not "have survived for any period of hours." (Tr. p. 320). Dr. Sozio ruled out Schafer's couch explanation or fall from the kitchen counter as cause of the injuries and concluded that this injury could not have been caused accidentally. Rather, Dr. Sozio affirmed that the cause of death was a combination of the blunt force trauma to the head and the femur fracture, with the manner of death being homicide.

[14] Dr. Tara Harris (Dr. Harris), board certified in child abuse pediatrics, testified that G.S.'s injuries were representative of abusive head trauma with additional evidence of severe physical abuse. She also opined that neither being hit with a plastic toy by a toddler, nor falling from the kitchen counter could have caused G.S.'s head injuries. Dr. Harris explained that when G.S.'s brain was being pushed into her spinal cord, the brain stem—which is "responsible for all the things that our body does without us having to think about it"—became damaged. (Tr. p. 353). "And you stop getting the signal telling your heart to beat and all of those important functions for life." (Tr. p. 354). She noted that the hermorhaging underneath G.S.'s skull had been caused by "blunt impact to

the head." (Tr. p. 354). In order to cause some of these injuries "[s]he had to have impact with objects [] not just shaking." (Tr. p. 374). Because G.S. had breastfed fine in the afternoon, Dr. Harris placed the time of the injuries "after 4:30 [p.m.]" (Tr. p. 355). She concluded that "[t]here was no history of any accident that would account" for G.S.'s injuries and it "would take a significant force" to fracture her femur. (Tr. pp. 358, 361).

[15] At the close of the evidence, the trial court found Schafer guilty of murder and battery with death of a person less than fourteen. On May 2, 2016, the trial court conducted a sentencing hearing and imposed a sentence of sixty years for murder, with five years suspended and 6,385 days' incarceration for battery, with sentences to run concurrent.

[16] Schafer now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Trial Court's Bias and Lack of Impartiality*

[17] Schafer first contends that the trial court was biased and exhibited a lack of impartiality by making certain comments throughout the proceedings and during the sentencing hearing, thereby violating his right to a fair trial. A trial before an impartial judge is an essential element of due process. *Everling v. State*, 929 N.E.2d 1281, 1287 (Ind. 2010). The impartiality of a trial court is especially important due to the great respect that a jury accords the judge and the added significance that a jury might give to any showing of partiality by the judge. *Id*. at 1287-88.

[18] In assessing a trial court's partiality, we examine the judge's actions and demeanor while recognizing the need for latitude to run the courtroom and maintain discipline and control of the trial. *Id*. at 1288. "Even where the court's remarks display a degree of impatience, if in the context of a particular trial they do not impart an appearance of partiality, they may be permissible to promote an orderly progression of events at trial." *Timberlake v. State*, 690 N.E.2d 243, 256 (Ind. 1997), *reh'g denied*. Bias and prejudice violate a defendant's due process right to a fair trial only where there is an undisputed claim or where the judge expressed an opinion of the controversy over which the judge was presiding. *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002). Adverse rulings and findings by a trial judge from past proceedings with respect to a particular party are generally not sufficient reasons to believe the judge has a personal bias or prejudice. *Voss v. State*, 856 N.E.2d 1211, 1217 (Ind. 2006). The mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing. *Id.*

[19] However, in order to prevail, a defendant has to make a contemporaneous objection to the presumed biased remark. Where a defendant fails to object or otherwise challenge a trial court's remarks, any alleged error is waived on appeal. *Garrett v. State*, 737 N.E.2d 388, 390 (Ind. 2000). Here, Schafer concedes to not having objected to the remarks. Knowing that he waived the issue, he now argues that the alleged biased remarks amounted to fundamental error. Fundamental error is error that represents a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the

defendant of fundamental due process. *Davis v. State*, 835 N.E.2d 1102, 1107 (Ind. Ct. App. 2005), *trans. denied*. The error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Id.* In determining whether a claimed error denies the defendant a fair trial, we consider whether the resulting harm or potential for harm is substantial. *Id.* This depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled. *Id.*

[20] Schafer points to three specific remarks made by the trial court, which, according to his argument, reflected bias and lack of impartiality towards him and resulted in an unfair trial. The first comment challenged by Schafer was uttered during the State's introduction of Schafer's text messages. During the trial, the State offered Exhibits 49 and 50, print outs of specific text messages, into evidence, as well Exhibit 41, which was a cell phone report. The trial court questioned the State about the text messages represented in Exhibits 49 and 50 and asked, "So these aren't the texts that have to do with him being frustrated and beating the child?" (Tr. p. 140). Schafer claims that the remark about him being frustrated and beating G.S. indicated that the trial court had already formed "a prejudicial impression of bad character[.]" (Appellant's Br. p. 16).

[21] Placed in the proper context, we cannot agree that the statement reflected judicial bias. Rather, at that point in the trial, the trial judge was well aware of the charges and had heard the parties' opening statements previewing the evidence during which the State had already indicated that G.S. had suffered

multiple injuries. The trial judge had also heard Johnson's testimony about Schafer's text messages on September 2nd and 3rd. Accordingly, in asking the question, the trial court merely attempted to place the exhibits in the proper context of the evidence presented. We perceive no bias or lack of impartiality.

[22] The second and third comments challenged by Schafer were remarks made by the trial court during the sentencing hearing. Specifically, the trial court remarked, "But what I heard in the interrogation doesn't make me feel good about him" and "he used a phone pin number to make that call to mom a week before trial. That doesn't say good things about his character." (Tr. pp. 425, 425). Placed in the context of the sentencing hearing, it is clear that the trial court was merely reflecting on the evidence in formulating its mitigators and aggravators for sentencing. Accordingly, the remarks did not reflect any bias but are just comments on what the evidence at trial established. Therefore, there was no error, let alone a fundamental error.[2]

## II. *Schafer's Statements*

[23] Prior to his arrest, Schafer made two statements to Detective Schemenaur: the first one in Detective Schemenaur's vehicle and the second one at the police station. Schafer now claims that the trial court abused its discretion by admitting both statements into evidence over his objection because the first

---

[2] Schafer also claims fundamental error occurred with respect to some remarks the trial court made during the admissibility of Schafer's jail call to his mother. We will address Schafer's arguments when discussing the admissibility of the phone call.

statement was given without the benefit of his *Miranda* warnings and the second statement was obtained pursuant to interrogation tactics condemned in *Missouri v. Seibert*, 542 U.S. 600, 611-14 (2004). Although Schafer filed a pre-trial motion to suppress, because he appeals following a bench trial, the issue is properly framed as whether the trial court abused its discretion in admitting the evidence. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). Accordingly, the general admission of evidence at trial is a matter we leave to the discretion of the trial court. *Id*. We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id*.

### A. *First Statement*

With respect to the statement given in Detective Schemenaur's police vehicle, Schafer claims that it amounted to a custodial interrogation during which he was never advised of his *Miranda* rights.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court instructed: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These "procedural safeguards" include advisements of the right to remain silent, that any statement made may be used against the person, and of the right to the presence of an attorney. *Id*. at 444. The purpose of *Miranda* warnings is to

secure the constitutional privilege against self-incrimination by providing procedural safeguards to be employed during questioning initiated by officers focusing on a person suspected of wrongdoing. *Id*. at 444. "[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of a crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id*. at 467. At the same time, *Miranda* also recognizes that "[a]ny statement given freely and voluntarily without any compelling influences is . . . admissible in evidence." *Id*.

[26] A custodial interrogation for purposes of the *Miranda* procedural safeguards is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom or action in any significant way." *Morales v. State*, 749 N.E.2d 1260, 1265 (Ind. Ct. App. 2001). Whether a criminal defendant is in custody turns on whether a reasonable person in the same circumstances would not feel free to leave. *Id*. This inquiry depends upon the "objective circumstances" as opposed to the subjective views of the interrogating officers or the subject being questioned. *Id*. Under *Miranda*, "interrogation" includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect. *White v. State*, 772 N.E.2d 408, 412 (Ind. 2002). Thus, "[p]olice officers are not required to give *Miranda* warnings unless the defendant is both in custody and subject to interrogation." *Ritchie v. State*, 875 N.E.2d 706, 717 (Ind. 2007), *reh'g denied*.

[27]   Schafer now maintains that by virtue of sitting in the police vehicle and answering the detective's questions, he was submitting to a custodial interrogation. However, "[q]uestioning an individual the police suspect of a crime does not inherently render the questioning custodial interrogation requiring *Miranda* warnings." *Luna v State*, 788 N.E.2d 832, 834 (Ind. 2003). When the police first contacted Schafer, he was at his residence with family and friends present. Schafer "was willing to talk [] and was responsive." (Tr. p. 25). Detective Schemenaur testified that it was "a normal routine process in [the] investigation to do an audio recording at the scene or around the scene so that [the officers] don't have to remove the parents." (Tr. p. 27). Schafer answered Detective Schemenaur's questions while seated in the front passenger seat of the vehicle. During the conversation, Schafer "described basically an event that was accidental in nature. That he had been co-sleeping with the child and that he had rolled over on the child." (Tr. p. 30). Schafer's statement was consistent and unwavering. Detective Schemenaur clarified that at no time during the statement did Schafer become a suspect. When the conversation was finished, Schafer exited the vehicle and joined his family and friends again. Only after the first statement was concluded did Detective Schemenaur speak with Detective Cook and became informed of the suspicious nature of some of G.S.'s injuries. Based on these facts, we conclude that the first statement did not amount to a custodial interrogation that required *Miranda* warnings.

B. *Second Statement*

With respect to the second statement at the police station, Schafer contends that it was obtained with an interrogation technique which had been disapproved of by the United States Supreme Court in *Missouri v. Seibert*, 542 U.S. 600, 611-14 (2004). He argues that "he had been subjected to one continuous series of custodial interrogations concerning the same incident, punctuated midstream by an advice of rights much as described by the *Seibert* court." (Appellant's Br. p. 28).

In *Seibert*, police officers arrested a suspect in an arson/murder investigation and refrained from giving her *Miranda* warnings. *Id*. at 2606. After questioning the suspect for thirty to forty minutes, she finally admitted that the death caused by the arson was not an accident. *Id*. The suspect was then given a twenty-minute break, after which the police officer turned on a tape recorder and gave her a *Miranda* warning. *Id*. The officer then resumed questioning her, confronting her with her pre-*Miranda* statement. *Id*. Determining that this second statement was inadmissible, the Supreme Court observed:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when

*Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

*Id*. at 2601. Following *Seibert*, in *Drummond v. State*, 831 N.E.2d 781, 783-84 (Ind. Ct. App. 2005), and *King v. State*, 844 N.E.2d 92, 98 (Ind. Ct. App. 2005), we determined that a defendant's statement was inadmissible when a defendant only received *Miranda* warnings after he was subjected to a custodial interrogation and had made incriminating statements.

[30] Schafer's argument that he received *Miranda* warnings midstream during his questioning by Detective Schemenaur at the police station is contradicted by the record. The evidence reflects that after Schafer's first statement, Detective Schemenaur was satisfied with his explanation that he had accidentally rolled over on to G.S. in his sleep. Only after Detective Schemenaur was advised by Detective Cook of the suspicious nature of some of G.S.'s injuries, Detective Schemenaur started to doubt the truthfulness of Schafer's explanation. As a result, there was a need for a second interview. Prior to commencing the interview at the police station, Detective Schemenaur read Schafer his *Miranda* rights. There was no continuing interrogation as the first interview had been satisfactorily concluded until new evidence arose that indicated the need to interview Schafer again. Prior to being confronted with the new evidence and making incriminating statements, Schafer was given his *Miranda* advisements. This was no 'question first, warn later' interrogation, nor was this a ruse to have

Schafer confess; rather, this was a second interview based on the evidence discovered during an ongoing investigation. Accordingly, *Seibert* does not apply.

[31]     Continuing his focus on the second statement, Schafer maintains that the statement was erroneously admitted because he did not knowingly and voluntarily waive his *Miranda* rights. A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights. *Ringo v. State*, 736 N.E.2d 1209, 1211-1212 (Ind. 2000). The admissibility of a confession is controlled by determining from the totality of the circumstances whether the confession was made voluntarily and was not induced by violence, threats, or other improper influences that overcame the defendant's free will. *Id*. at 1212. The same test determines whether *Miranda* rights were voluntarily waived. *Id*. Thus, the voluntariness of a defendant's waiver of rights is judged by the totality of the circumstances. *Id*. Factors that may be considered when reviewing the totality of the circumstances for whether a waiver of rights was voluntary, include "police coercion, the length of the interrogation, its location, its continuity, as well as the defendant's maturity, education, physical condition, and mental health." *State v. Keller*, 845 N.E.2d 154, 165 (Ind. Ct. App. 2006). A signed waiver of rights form is one item showing the accused was aware of and understood his rights. *Ringo*, 736 N.E.2d at 1212. When challenged, the State may need to show additional

evidence tending to prove that Defendant's waiver and decision to speak were voluntary. *Id.*

[32] The record indicates that prior to commencing the second interview, Detective Schemenaur explained to Schafer that he had received new information which required them to talk again. He explained that

> the difference is, is we are no longer there, out in front of your residence where you are at. We have transported you away from that location. We're down here. So it's it's a different setting. So consequently whenever we do that we do go over what's called an advisement and waiver of rights document. And that's basically just, you know [] any time we transport somebody down here and we have any additional follow-up questions we go through that document. So that's what we're going to do first. [] I'm going to read this document to you. And if you have any questions about it, please ask me.

(Appellant's App. p. 42). Detective Schemenaur then proceeded to read the advisement form to Schafer and asked Schafer if he understood his rights. Schafer replied affirmatively and signed the waiver of rights. During the suppression hearing, Schafer agreed that Detective Schemenaur had read him the advisement form line by line. Schafer is not uneducated: he is a high school graduate and attended college for a year. Besides some generalized statements that the explanation of Detective Schemenaur for reading the advisement form because "we're down here" was confusing, Schafer fails to point to any coercion or circumstances which would have overcome the voluntariness of his waiver of rights. (Appellant's App. p. 42). Based on the

evidence before us, we conclude that the trial court properly admitted Schafer's statements.

### III. *Admission of Prior Bad Act Evidence*

[33] Schafer appears to argue that the trial court abused its discretion when it admitted G.S.'s medical records and a selected reading of Schafer's text messages "outside the time window of the day leading up to the victim's death."[3] (Appellant's Br. p. 33). Referencing Indiana Evidence Rule 404(b), Schafer contends that the medical records and text messages were irrelevant and admitted solely to establish the improper purpose of showing action in conformity therewith.

[34] Indiana Evidence Rule 404(b) provides, in pertinent part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

The rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so-called 'forbidden inference.'" *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004), *trans. denied*. Thus, in

---

[3] Schafer also claims that the trial court erroneously admitted the jail phone call to his mother in violation of Ind. Evidence Rule 404(b). However, as Schafer did not object to its admission on this ground at trial, his argument is waived. *See Lehman v. State*, 730 N.E.2d 701, 703 (Ind. 2000).

assessing the admissibility of evidence under Ind. Evidence Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evid. R. 403. *Id.* To determine whether the trial court abused its discretion, we employ the same test. *Id.*

[35] Our review of the record discloses that the State did not introduce G.S.'s medical records of emergency room visits for August 23, 2014 or August 30, 2014 into evidence even though its 404(b) notice indicated an intent of doing so. Accordingly, we will not address Schafer's argument with respect to the medical records. To the extent Schafer now challenges the testimony of Dr. Harris where "she sponsored a summary of the child's medical history that not only contained a description of every major instance of medical treatment received by the child, but also added her conclusion that the history suggested abuse on those previous occasions," Schafer did not object to the introduction of the report at trial. (Appellant's Br. p. 34). It is generally accepted that where a defendant fails to object to the introduction of evidence, the defendant waives the claim. *See, e.g., Moore v. State*, 669 N.E.2d 733, 742 (Ind. 1996).

[36] Exhibits 46 through 49 consist of text messages between Johnson and Schafer which the State introduced to establish Schafer's intent, motive, and lack of accident. Exhibit 46 are text messages dated August 25, 2014, in which Schafer expressed frustration with G.S. and Johnson gave advice on what to do. Specifically, faced with G.S.'s refusal to take a bottle, Schafer texted "I'm a

horrible fucking father to her. [I don't know] what she[,]" to which Johnson responded, "Walk with her. Give her an ounce change her wrap." (State's Exh. 46). Exhibit 47 is a text message from Schafer to Johnson sent on August 28, 2014, in which he exclaimed:

> [G.S.] won't take the fucking bottle. She's the most stubborn fucking baby ever.
>
> You're done breast feeding.
>
> I can't put up with this shit anymore. It's not fair to me.

(State's Exh. 47). In Exhibit 48, sent on August 29, 2014, Johnson queried Schafer about a bruise on G.S.'s face, of which Schafer disavowed all knowledge. Lastly, in Exhibit 49, also sent on August 29, 2014, Schafer again expressed frustration with G.S.'s crying and refusal to take a bottle.

[37]  At trial, the State sought the admission of these text messages

> to show [Schafer's] anger and his built up frustration relationship with his 9 week old. That is clearly by the case law that I cited in our 404B hearing, that is clearly to establish A) that there was a frustrating, hostile relationship, B) that this was not by accident, and that this was his mentality and him saying it was a mistake, him saying it was an accident. This clearly denotes it, in our opinion, that it wasn't an accident.

(Tr. pp. 225-26). Schafer objected to the admission of the texts based on relevancy and to being more prejudicial than probative. The trial court admitted the Exhibits over Schafer's objection.

[38] We conclude that the trial court properly admitted Exhibits 46 through 49 pursuant to Evid. R. 404(b). The Exhibits clearly have a bearing on Schafer's defense theory that G.S.'s death was accidental rather than intentional as the text messages paint a situation at home characterized by Schafer's growing frustration and anger with his infant daughter. As such, Schafer's state of mind leading up to the events on the night of September 2, 2014, are relevant and probative to establish intent and the absence of an accident. Schafer now argues that the admission of an "extremely small sample size" of text messages is prejudicial and selective as it would "allow for maximum manipulation of impact on the listener with isolated, often out of context, expressions that did not necessarily reflect the defendant's true or ongoing character or state of mind." (Appellant's Br. p. 37). Because Schafer failed to raise this argument before the trial court, his claim is waived. *See Lehman v. State*, 730 N.E.2d 701, 703 (Ind. 2000) ("When [] a defendant presents one argument at trial and a different argument on appeal, the claims are forfeited.").

IV. *Phone Call from Jail*

[39] Next, Schafer challenges the admissibility of the phone call he placed from jail to his mother because it was untimely disclosed to his defense counsel. Trial courts are given wide discretion in discovery matters because they have the duty to promote the discovery of truth and to guide and control the proceedings. *Dye v. State*, 717 N.E.2d 5, 11 (Ind. 1999), *cert. denied* 531 U.S. 957 (2000). They are granted deference in determining what constitutes substantial compliance with discovery orders, and we will affirm their determinations as to violations and

sanctions absent clear error and resulting prejudice. *Id*. When remedial measures are warranted, a continuance is usually the proper remedy, but exclusion of evidence may be appropriate where the violation has been flagrant and deliberate, or so misleading or in such bad faith as to impair the right of fair trial. *Id*. Exclusion of evidence as a remedy for a discovery violation is only proper where there is a showing that the State's actions were deliberate or otherwise reprehensible, and this conduct prevented the defendant from receiving a fair trial. *Warren v. State*, 725 N.E.2d 828, 832 (Ind. 2000).

[40] Six days before trial, on April 12, 2016, Schafer called his mother from jail, using another inmate's PIN. During the conversation, Schafer's mother advised him of a possible "fourth version of what could have happened." (Tr. p. 283). The State received notification of the existence of this phone call on Wednesday, April 13, 2016, and certified the call by late afternoon of the following day. The phone call was discovered by the State to Schafer's counsel on Friday, April 15, by 1:25 p.m. Schafer's trial commenced Monday, April 18, 2016. When the State requested to admit the phone call, Schafer objected based on relevancy, late discovery, and the fact that the sponsoring witness was not a voice recognition expert. The trial court admitted the phone call over objection, finding that "[i]n terms of the delay it's not unconscionable. [The

State] got notice, she did what she had to do. She followed the procedure[.]" (Tr. p. 280).[4]

[41] The State turned over the evidence as soon as it was discovered. Moreover, Schafer does not allege that he was taken by surprise by the evidence at trial, rather his counsel admitted to having listened to the phone call prior to trial. "There is no error when the State provides a defendant evidence as soon as the State is in possession of requested evidence." *Id.* Accordingly, the State properly admitted the phone call.

## V. *Exculpatory Evidence*

[42] Schafer appears to contend that his due process rights were violated by the State's failure to preserve materially exculpatory evidence stored on Johnson's and Schafer's cell phones. Evidence is materially exculpatory if it possesses an exculpatory value that was apparent before the evidence was destroyed and is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means. *Terry v. State*, 857 N.E.2d 396, 406 (Ind. Ct. App. 2006), *trans. denied.* When the State fails to preserve materially exculpatory evidence, a due process violation occurs regardless of whether the State acted in bad faith. *Id.* While the defendant is not required to prove conclusively that the destroyed evidence is exculpatory, there must be

---

[4] Schafer claims that this statement is a clear instance of bias and lack of impartiality by the trial court. As with his previous claims of bias, we also reject this one as the trial court merely made a procedural decision on the late discovery and admissibility of the phone call.

some indication of its exculpatory nature. *Blanchard v. State*, 802 N.E.2d 14, 27 (Ind. Ct. App. 2004). If the defendant fails to demonstrate the evidence's exculpatory nature, we will not simply assume that the destroyed evidence contained exculpatory material when the record is devoid of such indication. *Id.* In *Chissel v. State*, 705 N.E.2d 501, 504 (Ind. Ct. App. 1999), *trans. denied*, we held that videotapes of the defendant taking field sobriety tests were not materially exculpatory because the defendant presented no evidence that the tapes would show him passing the tests, and instead asked us to speculate as to the tapes' contents.

[43] The State seized Schafer's cell phone as soon as it became aware of its existence and location. After obtaining a search warrant, it extracted the data from Schafer's phone. Instead of explaining what data the State lost and how it could have been exculpatory, Schafer's argument focuses on text messages that were located and admitted over his objection, as well as text messages that neither party entered into evidence. Schafer's entire argument appears to be a mere speculation of what could have happened if certain pieces of evidence might exist. As Schafer presents no evidence of the existence of exculpatory text messages or their content, his due process rights were not violated.

## VI. *Sufficiency of the Evidence*

[44] Lastly, Schafer contends that the State failed to present sufficient evidence beyond a reasonable doubt to support his conviction for murder and battery leading to the death of a person less than fourteen. Our standard of review for a

sufficiency of the evidence claim is well settled. In reviewing sufficiency of the evidence claims, we will not reweigh the evidence or assess the credibility of the witnesses. *Moore v. State*, 869 N.E.2d 489, 492 (Ind. Ct. App. 2007). We will consider only the evidence most favorable to the judgment, together with all reasonable and logical inferences to be drawn thereof. *Id.* The conviction will be affirmed if there is substantial evidence of probative value to support the conviction of the trier of fact. *Id.*

[45] To support a conviction for murder, the State was required to establish that Schafer knowingly or intentionally killed G.S. *See* I.C. § 35-42-1-1. Furthermore, "[a] person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death or causes: (1) serious permanent disfigurement; (2) protracted loss or impairment of the function of a bodily member or organ; or (3) the loss of a fetus; commits aggravated battery, a Level 3 felony." I.C. § 35-42-2-1.5. This offense becomes a "Level 1 felony, if, as here, it results in the death of a child less than fourteen (14) years of age and is committed by a person at least eighteen (18) years of age." I.C. § 35-42-2-1.5. Schafer challenges the *mens rea* and his identity as the perpetrator of the crimes with respect to both charges,.

[46] Intent is statutorily defined as "[a] person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." I.C. § 35-41-2-2(a). "Knowingly" is defined as "[a] person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). In *Anderson v. State*, 681

N.E.2d 703, 708 (Ind. 1997), the defendant challenged the sufficiency of the evidence to support the requisite *mens rea* of the murder of a 21-month old child. Our supreme court found sufficient evidence to support the element of an intentional killing because "[f]rom the severity of [the child's] injuries . . . the jury could have concluded beyond a reasonable doubt that defendant knowingly killed [the child] and did not just intend to stop her from crying." *Id*.

[47]     On the day of her death, G.S. was ten weeks old; Schafer was twenty-three. Dr. Harris concluded that G.S.'s extensive injuries were representative of abusive head trauma with additional evidence of severe physical abuse. G.S. also had trauma to her mouth, which Dr. Harris opined could only have occurred when something was forcibly shoved into the mouth. The bruising G.S. had incurred on her chest could not have been sustained by CPR and had required a lot of force. In turn, Dr. Sozio affirmed that G.S.'s chest injuries had to have been caused by blunt force trauma. Dr. Sozio also testified to G.S.'s femur fracture, which had been caused by a twisting external force and which would have resulted in "extreme pain, crying profusely, [and] not eating." (Tr. p. 315). Dr. Sozio opined that G.S.'s skull was not fractured, but there was subdural and subarachnoid hemorrhage underneath the skull, which had been caused by "any type of shaking injury." (Tr. p. 319). G.S.'s brain had undergone "severe swelling" to the point her brain "was forcibly being protruding through any orifice or hole that it could find []—in this case, the spinal cord." (Tr. p. 319). Both doctors expressly ruled out Schafer's couch explanation or fall off the kitchen counter as possible causes of G.S.'s injuries. Accordingly, based on the

severity of G.S.'s injuries and Schafer's relative age, there was sufficient evidence from which the fact finder could have concluded beyond a reasonable doubt that Schafer intentionally killed his infant daughter.

[48] Similarly, the identity of the abuser is established beyond a reasonable doubt. Schafer was caring for G.S. from the time Johnson left for work around 4:30 p.m. until she passed away. Prior to leaving for work, Johnson had fed G.S. and G.S. was sleeping in her swing. Starting at 8:45 p.m., Johnson received several texts from Schafer expressing his increasing frustration with G.S.'s refusal to take a bottle. When Johnson was on her way home, sometime after midnight, she received a phone call from Schafer informing her that G.S. was unresponsive. Reflecting on this time line of events and the nature of G.S.'s injuries, Dr. Harris placed the time of the trauma "after 4:30 [p.m.]" (Tr. p. 355). This was confirmed by Dr. Sozio, who testified that with her extensive injuries G.S. would not "have survived for any period of hours." (Tr. p. 320).

[49] Mindful of the evidence before us, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support Schafer's conviction of murder and battery leading to the death of a person less than fourteen.

## CONCLUSION

[50] Based on the foregoing, we hold that (1) the trial court did not express bias and a lack of impartiality when making certain statements during the proceedings; (2) the trial court properly admitted Schafer's statements to the police officers; (3) the trial court did not abuse its discretion by admitting certain evidence of

prior misconduct pursuant to Indiana Rules of Evidence 404(b); (4) Schafer's jail phone call to his mother was properly admitted into evidence; (5) the State did not fail to preserve evidence; and (6) the State presented sufficient evidence beyond a reasonable doubt to support Schafer's conviction.

Affirmed.

Crone, J. and Altice, J. concur