## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 02 2020, 8:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia M. Carter
Law Office of Cynthia M. Carter, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ray Chamorro,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

July 2, 2020

Court of Appeals Case No.
19A-PC-1220

Appeal from the White Superior
Court

The Honorable Robert W.
Thacker, Special Judge

Trial Court Cause No.
91D01-1503-PC-1

**May, Judge.**

[1]    Ray Chamorro appeals the denial of his petition for post-conviction relief.  He presents multiple issues for our review, which we restate as:

> 1.  Whether Chamorro's trial counsel was ineffective when he did not request a prospective juror be removed from the juror pool;
>
> 2.  Whether Chamorro's trial counsel was ineffective when he did not admit into evidence certain pictures or challenge inconsistencies from testimony of some witnesses; and
>
> 3.  Whether Chamorro's trial counsel was ineffective when he did not object to certain witness testimony and certain comments made by the prosecutor.

We affirm.

# Facts and Procedural History

[2]    The facts of Chamorro's conviction were set forth in his direct appeal:

> On October 1, 2012, Alexandria Chapman (Chapman) communicated to David Jones (Jones) that she wanted to "get high."  On the same day, Jones called Robert Breeden (Breeden), a drug supplier, met with him, and purchased a quarter gram of methamphetamine.  Jones took it back to Chapman's house.  Also present at the house [were] Robby Brown (Brown) and Chamorro.  According to Jones, he gave a little bit of the methamphetamine to Brown, Chamorro, and Chapman.  He then used the rest of the methamphetamine.  Jones never felt a rush.  The next day, Jones received a phone call from Chris Martin (Martin), also a friend to Breeden, who told him that Breeden had sold him bad drugs.  Soon after, Jones placed a call

to Breeden and complained [about] the bad drugs. Breeden promised Jones he would take care of him the next time he cooked a batch.

On October 3, 2012, Chamorro, Jones, Brown, Chapman, and LaShae Ramsey (Ramsey) were hanging out at Brown's house. That evening, Jones called Breeden several times, demanding that he deliver[] on his promise and replace the bad drugs. During one of the many phone calls that Jones made to Breeden, Tye Rentfrow (Rentfrow), a friend to Breeden and [sic] who also helped to manufacture the methamphetamine, grabbed the phone from Breeden and told Jones, "[y]ou'll get it at [7:00] a.m." Jones asked who he was talking to, and Rentfrow responded, "It's your daddy, bitch." The comment angered Jones, and he started arguing with Rentfrow. Jones kept calling Breeden's phone, but every time either Rentfrow or Breeden would hang up. On one of the calls that went through, Chamorro grabbed the phone from Jones and started yelling at Rentfrow, asking him, "Do you know who the fuck you're talking to, bitch? [ ] Where the fuck you at?"

After the heated exchange, Chamorro and Jones decided to go find Rentfrow. Before that though, Chamorro wanted to go back to his house to obtain his gun. At the time, Ramsey was the only person who had a car. At first she refused to take Chamorro, but she eventually agreed. All five got in the car and drove to Chamorro's house. After Chamorro retrieved his gun, Ramsey drove the men to Martin's house. Martin's house, to some extent, operated as a flop house where people, including Breeden spent time. On their way their way [sic] to Martin's house, according to Ramsey, Jones asked Chamorro why he needed the gun and Chamorro responded by saying "I'm tired of people out here thinking I'm a bitch. I'm going to show them I ain't a bitch." Ramsey dropped off Chamorro, Jones, and Brown at Martin's house and then she left with Chapman.

Once Chamorro, Jones, and Brown were inside the house, they found a passed out Martin in the hallway. Jones shook him aggressively until he woke up. Next, Chamorro pointed a gun to Martin's head and asked him to call Breeden. Martin called Breeden and asked him to bring back his car which Breeden had been borrowing. Breeden promised Martin that he would be at Martin's house in about ten minutes. They waited for about ten to fifteen minutes before Martin suggested that Breeden and Rentfrow might be down at "Tioga Bridge," cooking methamphetamine. Just as the men were leaving Martin's house, Breeden and Rentfrow pulled into the driveway in Martin's car. Jones and Chamorro saw the car as they were walking away from the house, so they changed their course and ran toward Martin's car. Rentfrow hopped out from the passenger seat. Once outside the car, Jones asked Rentfrow if he had called him a bitch, but Rentfrow denied having said that. At that moment, Jones punched Rentfrow in the face. Rentfrow staggered back toward the car but caught his balance and came right back. At that point, Chamorro pulled out his gun and shot straight at Rentfrow. Rentfrow ran from the scene screaming, clutching his chest but later fell at the corner of the Martin's house. Chamorro also fired two additional shots toward the house as he was running away from the scene. During the same time or close to the end of the third shot, Jones, Brown, and Chamorro took off running in different directions but soon reunited at a high school nearby. Brown then called Ramsey and asked her to pick them up. Before Chamorro got inside the car, he hid the gun under a garbage can. While in the car, Chamorro admitted that he had shot Rentfrow in the chest. Ramsey drove Chamorro and Jones to Chicago and returned to Indiana with Brown and Chapman. Meanwhile, at the crime scene, Breeden called 911, and shortly thereafter the police arrived, arrested Breeden and started their investigation.

*Chamorro v. State*, 91A05-1309-CR-445, *1-*2 (Ind. Ct. App. 2014) (internal citations to the record omitted), *trans. denied*. Rentfrow died, and the State

charged Chamorro with murder.[1] After a jury found Chamorro guilty as charged, the trial court entered Chamorro's conviction and sentenced him to sixty years executed in the Department of Correction.

[3] Chamorro filed a direct appeal, arguing the trial court abused its discretion when it refused to instruct the jury on self-defense and the trial court abused its discretion when it admitted two autopsy photographs of the victim. *Id*. at *1. A panel of our court held the trial court did not abuse its discretion when it did not give a jury instruction on self-defense because there was "no evidence to support the tendering of the instruction." *Id*. at *3. Our court also held the trial court did not abuse its discretion when it admitted the autopsy photographs in question because they were "relevant and their probative value outweighed any potential prejudice to Chamorro." *Id*. at *5. After our court affirmed Chamorro's conviction, our Indiana Supreme Court denied Chamorro's request for transfer.

[4] On March 26, 2015, Chamorro filed a *pro se* petition for post-conviction relief in which he claimed that he received ineffective assistance of trial and appellate counsel and that there existed newly discovered evidence. The post-conviction court forwarded Chamorro's petition to the State Public Defender for review. On October 13, 2017, the State Public Defender moved to withdraw from the case under Indiana Post-Conviction Rule 1(9)(c).

---

[1] Ind. Code § 35-42-1-1.

[5]     On November 20, 2017, Chamorro filed a *pro se* motion for summary disposition of his petition because State had yet to file a response. The trial court denied Chamorro's motion for summary disposition on December 22, 2017, and scheduled a hearing on the matter for January 31, 2018. The State filed its answer to Chamorro's petition for post-conviction relief on January 8, 2018. Therein the State asserted the affirmative defense of laches. Chamorro objected to the State's belated response and filed a *pro se* motion to reconsider, asking the post-conviction court to reconsider his motion for summary disposition. The trial court held a hearing on Chamorro's motion on May 7, 2018. Chamorro retained counsel prior to the May 7 hearing, and counsel has represented Chamorro throughout the remainder of these proceedings. On June 4, 2018, after receiving proposed findings of fact and conclusions of law from both parties, the post-conviction court granted the State permission to file its belated response on January 8, 2018, and denied Chamorro's motion to reconsider his request for summary disposition.

[6]     On December 11, 2018, the post-conviction court held an evidentiary hearing on Chamorro's petition for post-conviction relief. Chamorro presented evidence from Olivia Young, a juror at his trial; Patrick Manahan, Chamorro's trial counsel; and Steven Knecht, Chamorro's appellate counsel. Chamorro also testified on his own behalf and presented additional evidence in the form of photographs and audio and video recorded statements from State's witnesses from his trial. The State did not present any evidence or testimony. On April 30, 2019, after both parties submitted their proposed findings of fact and

conclusions of law, the post-conviction court denied Chamorro's petition for post-conviction relief.

# Discussion and Decision

[7] Post-conviction proceedings afford petitioners a limited opportunity to raise issues unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). As post-conviction proceedings are civil in nature, the petitioner must prove his grounds for relief by a preponderance of the evidence. *Id.* A party appealing a negative post-conviction judgment must establish that the evidence is without conflict and, as a whole, unmistakably and unerringly points to a conclusion contrary to that reached by the post-conviction court. *Id.* Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we do not defer to the court's legal conclusions, but "the findings and judgment will be reversed only upon a showing of clear error - that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (citation omitted), *cert. denied*, 530 U.S. 830 (2001).

[8] We review claims of ineffective assistance of trial counsel under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail, a claimant must show that trial counsel's performance fell below an objective level of reasonableness based on prevailing professional norms, *Taylor v. State*, 882 N.E.2d 777, 781 (Ind. Ct. App. 2008), and that the deficient

performance resulted in prejudice. *Id.* "Prejudice occurs when the defendant demonstrates that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (quoting *Strickland*, 466 U.S. at 694). We need not consider whether counsel's performance fell below the objective standard if the performance would have not changed the outcome. *Strickland*, 466 U.S. at 687.

## 1. Failure to Excuse Juror

During voir dire in Chamorro's trial, one potential juror, Olivia Young (hereinafter, "Juror"), disclosed that her husband, Roger Young (hereinafter, "Marshal"), was the Monon Town Marshal and that she was related to someone who worked for the Monticello Police Department. Chamorro's trial counsel did not strike Juror from the jury and she served on the jury. Chamorro argues his trial counsel was ineffective because trial counsel "was remiss in not moving to excuse [Juror,] and his failure to timely do so resulted in the impaneled jury being tainted." (Br. of Appellant at 29.)

"Generally, proof that a jury was biased against the defendant or lied during voir dire entitles a defendant to a new trial. A defendant seeking a new trial because of juror misconduct must show gross misconduct that probably harmed the defendant." *Warner v. State*, 773 N.E.2d 239, 246 (Ind. 2002) (internal citations omitted). In *State v. Dye*, 784 N.E.2d 469 (Ind. 2003), our Indiana Supreme Court upheld a post-conviction court's ruling to overturn Dye's

murder conviction and death penalty sentence based on juror misconduct, holding, "the post-conviction court here concluded that juror Gunn made omissions and false statements on her jury questionnaire and during voir dire, that those responses amounted to gross misconduct, and probably harmed the defendant by denying him a fair trial." *Id*. at 473. In *Dye*, juror Gunn "concealed her and her family's criminal histories, her history as a victim of a crime, and her disposition to impose the death penalty." *Id*. at 471.

[11] Similarly, in *Dickenson v. State*, 732 N.E.2d 238 (Ind. Ct. App. 2000), we reversed Dickenson's conviction of attempted murder based on juror misconduct because juror Lane misrepresented her relationship with Dickenson and the victim's wife and was not truthful when she indicated she did not have previous knowledge of the case. *Id*. at 241-2. Chamorro argues the facts here are similar to *Dye* and *Dickenson*, because "a total of three jurors indicated they were aware of facts through an outside source, that being a law enforcement officer who was related to [Juror.]" (Br. of Appellant at 28.)

[12] Juror was called as a witness during Chamorro's post-conviction hearing, and she testified that she was related to a law enforcement officer but she did not "think he had anything to do with the case or anything." (Tr. Vol. II at 38.) When asked if she remembered having "any discussions about the case with any law enforcement officers prior to the trial[,]" (*id*.), Juror indicated that she did not remember any, but then later answered that she "probably" had a "conversation with some law enforcement officer about the facts of this case[.]" (*Id*. at 39.) During voir dire at trial, Juror told the court her husband, Marshal,

and cousin, Curt Blount, worked in law enforcement. (App. Vol. II at 207.) Trial counsel did not ask if she had any knowledge of the facts of the case prior to trial.

[13] Later during voir dire, one other prospective juror indicated he visited with Marshal "[o]ften" and the case had been a topic of discussion "[p]robably a time or two." (*Id*. at 235.) When questioned about his familiarity with the case, that juror indicated he was "pretty much" a "blank slate" despite knowing and visiting with Marshal, working at a local business, and reading the newspaper. (*Id*. at 236.) Another prospective juror indicated the source of information the prospective juror had about the case was Marshal. (*Id*. at 237.) Based thereon, Chamorro argues Juror's presence on the jury "resulted in the impaneled jury being tainted." (Br. of Appellant at 29.)

[14] In *Dye*, our Indiana Supreme Court found juror misconduct in a case where Dye was charged with murder and faced the death penalty, the juror in question did not disclose that her brother had been imprisoned in California for murder and had received the death penalty, that she had been arrested for driving while intoxicated, and that she was a victim of sexual abuse. *Dye*, 784 N.E.2d at 472. In *Dickenson*, our court reversed Dickenson's conviction based on the fact that the juror in question did not reveal she was a close friend of the victim's wife and had discussed the incident with the victim's wife prior to trial. *Dickenson*, 732 N.E.2d at 240. Here, Chamorro has not demonstrated Juror answered any question set forth in voir dire untruthfully, and he has not presented evidence as part of the post-conviction proceedings to demonstrate that his trial counsel's

failure to further inquire into Juror's prior knowledge of the case or her relationship to law enforcement prejudiced him. Based thereon, Chamorro has not demonstrated his trial court was ineffective for failing to dismiss Juror. *See Green v. State*, 994 N.E.2d 1276, 1282 (Ind. Ct. App. 2013) (trial counsel's failure to object to jury issue did not prejudice petitioner and thus was not ineffective assistance), *trans. denied*.

## 2. Failure to Present Evidence to Support Self-Defense

Self-defense is a legal justification for what would otherwise be a criminal act. *Brown v. State*, 738 N.E.2d 271, 273 (Ind. 2000). A person is justified in using "reasonable force" against another to protect himself from what he reasonably believes to be the imminent use of unlawful force. *Id.*; *see also* Ind. Code § 35-41-3-2 (elements of self-defense). To prevail on a claim of self-defense, the defendant must present evidence that he: (1) was in a place he had a right to be, (2) did not provoke, instigate, or participate willingly in the violence, and (3) had a reasonable fear of death or great bodily harm. *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002). An initial aggressor must withdraw from the encounter and communicate the intent to do so to the other person before he may claim self-defense. *Id.* at 801. When a defendant claims he acted in self-defense, the State must disprove or rebut at least one element of self-defense beyond a reasonable doubt. *Carroll v. State*, 744 N.E.2d 432, 433-34 (Ind. 2001). The State may do so by presenting additional evidence or by relying on the evidence in its case-in-chief. *Id.*

[16]    On direct appeal, Chamorro argued the trial court abused its discretion when it refused Chamorro's jury instruction on self-defense. *Chamorro* at *3. Our court rejected that argument:

> In denying Chamorro's self-defense instruction, the trial court noted that Chamorro provoked and instigated the confrontation. We also note that Chamorro's claim of self-defense failed in two ways - Chamorro did not act without fault, and he was not in reasonable fear of death or great bodily harm. The evidence shows that it was Chamorro who brandished the gun and fired shots at Rentfrow. Prior to the shooting, Chamorro was angry at Rentfrow for disrespecting him on the phone. Chamorro and Jones wanted to find Rentfrow and seek revenge. First, they drove to Chamorro's house, where Chamorro picked up his gun. Afterwards, Ramsey drove the men to Martin's house. When they were inside Martin's house, Chamorro pointed his gun at Martin and demanded that he call Breeden. When Breeden and Rentfrow pulled into the driveway, both Chamorro and Jones, who were walking away from Martin's house, changed their course and ran toward the car to confront Breeden and Rentfrow. When Rentfrow jumped out of the vehicle, neither Chamorro nor Jones retreated. Instead, Jones punched Rentfrow in the face, and Chamorro pulled out his gun and shot Rentfrow.

> Moreover, the evidence does not show that Chamorro was in reasonable fear of death or great bodily harm. Chamorro's self-serving testimony that during the altercation, Rentfrow dipped his hands in his sweater as if to reach out for "something steel" from his pocket, is simply a request for this court to reweigh the evidence and credit his version of events, which we will not do.

> In addition, the trial court's decision refusing to tender the self-defense instruction was premised on the fact that Chamorro was the initial aggressor and that he first opened fire to an unarmed

> Rentfrow.  Lastly, we find that Chamorro's use of force was
> excessive, thus his right to claim self-defense was extinguished.

*Id.*

[17]  Chamorro argues his trial counsel was ineffective for failing to present four photographs taken at the crime scene which depicted knives found near the victim, Rentfrow, and for failing to draw the jury's attention to inconsistencies in the statements of two of the State's witnesses.  He contends that, had his trial counsel presented this evidence, the trial court would have given the jury his proffered instruction on self-defense, and he would have been acquitted of the murder or convicted of a lesser-included offense.

### A. Additional Photographs of a Knife Found at the Scene

[18]  During Chamorro's trial, Chamorro's trial counsel cross examined Monticello Police Officer Jason Lingenfelter about knives that were found at the scene of the crime.  When asked whether a knife was found at the crime scene, Officer Lingenfelter admitted there was "a knife recovered near the location of Mr. Rentfrow's body[.]"  (Prior Case Tr. Vol. II at 400.)  Officer Lingenfelter also testified there was a "knife found near the southwest corner of the red car that was parked in the driveway[,]" (*id.* at 401), and he "removed seven knives" from Martin, the resident of the house where the crime occurred.  (*Id.* at 376.)

[19]  Monticello Police Officer Nate Miller also testified he photographed a "black colored, metal type knife" at the scene.  (*Id.* at 462.)  The photograph of the knife where it was found at the crime scene was admitted into evidence.  Officer

Miller also noted the location of the knife on an aerial photo of the crime scene. Finally, during the cross examination of Timothy Pycraft, a forensic scientist who performed the latent print examinations, Chamorro's trial counsel elicited testimony about a "dagger-style knife" found at the scene and given to Pycraft by Officer Lingenfelter for fingerprint analysis. (*Id*. at 347.) Pycraft testified that his examination of the knife yielded "[n]o latent prints of value." (*Id*.)

[20] During the post-conviction hearing, Chamorro's trial counsel did not recall specifically why he did not offer the photographs at issue during the trial. He testified, "I remember there being discussions through maybe law enforcement officers about knives that were found" and that he would "defer to what the officers [sic] testimony was at the trial[.]" (PCR Tr. at 49.) Chamorro's appellate counsel also testified at the post-conviction hearing that he argued that the trial court abused its discretion when it did not give the jury an instruction on self-defense because he "believe[d] that there was a knife found back in the general area where the victim's body was found, so [he] thought there was evidence to support but [sic] there may have been a weapon involved in the case." (*Id*. at 75.)

[21] Chamorro's trial counsel elicited new testimony regarding knives on cross examination of two witnesses. The jury was presented testimony that there was a knife found near the victim, and Officer Miller illustrated its location on the map. The jury received a description of the knife. Chamorro has not demonstrated how four photographs depicting the knife near the victim would have changed the trial court's decision to not instruct the jury on self-defense.

Additionally, the court in Chamorro's direct appeal noted that self-defense was unavailable based on Chamorro's "excessive use of force," *Chamorro*, at *3, suggesting that any additional information about the location of a knife, when the jury had already heard about the knife's existence, would not have changed the outcome of the case. Thus, Chamorro has not demonstrated he received ineffective assistance based on his trial counsel's failure to present the additional photographs of the knife in question.

### B. *Witnesses' Prior Inconsistent Statements*

[22] During Chamorro's trial, Robert Breeden, Rentfrow's companion who allegedly sold bad drugs to Chamorro's friend, Jones, testified that he and Rentfrow were going to go to Chris Martin's house and "get high" and "make the debt good" with Jones. (Prior Case Tr. Vol I at 135.) Chamorro argues this testimony contrasted with Breeden's testimony in an interview with police where Breeden told police that he and Rentfrow were going to Martin's house to engage in a physical altercation. Chamorro also points to inconsistencies in Breeden's testimony about who was present when Breeden and Rentfrow arrived at Martin's house, how the incident occurred, and Breeden's identification of the shooter. Chamorro contends the inconsistencies in Breeden's testimony would have supported his claim of self-defense by portraying Rentfrow as an aggressor.

[23] Similarly, another witness, Robby Brown, testified at trial that Rentfrow attempted to flee from Jones after Jones punched Rentfrow. However, in a police interview, Brown indicated Rentfrow reached into his pocket while Jones

punched him. Chamorro also directs us to other inconsistencies in Brown's testimony about the number of shots he heard during the incident and when those shots occurred. Chamorro maintains that had his trial counsel impeached Brown, that impeachment would have bolstered his claim of self-defense.

[24] Chamorro contends that because his trial counsel did not solicit this specific impeachment testimony from Breeden and Brown, his trial counsel rendered ineffective assistance. However, trial counsel did cross examine Breeden and Brown at length, and he asked Brown why he had lied to police in his initial statement. While it is possible that Chamorro's trial counsel could have asked additional questions about alleged inconsistencies in the testimonies of Breeden and Brown, his failure to do so did not raise to the level of ineffective assistance. Chamorro's trial counsel presented evidence and argument to support a claim of self-defense, such as asking multiple witnesses about knives found at the scene when the State did not bring forth such evidence and procuring Chamorro's testimony that he saw Rentfrow attempt to draw a knife. We therefore conclude Chamorro's trial counsel was not ineffective for failing to ask additional questions regarding any inconsistencies in Breeden and Brown's trial testimony. *See Blanchard v. State*, 802 N.E.2d 14, 34 (Ind. Ct. App. 2004) ("isolated poor strategy or bad tactics do not necessarily amount to ineffective assistance of counsel unless, taken as a whole, the defense was inadequate").

# 3. Failure to Object

## *A. Trial Testimony*

[25] As part of Chamorro's trial, the trial court entered a motion in limine prohibiting the State from referencing Chamorro's membership in a gang. During the trial, the State asked multiple witnesses associated with Chamorro if they were members of the same gang, to which they all answered affirmatively. Chamorro argues his trial counsel was ineffective because he did not object to the State's questions regarding the other witnesses' gang membership. However, as the motion in limine specifically prohibited asking Chamorro a question about his gang affiliation, it is unlikely any objection would have been successful and thus Chamorro's trial counsel was not ineffective for failing to object to those questions. *See Taylor*, 929 N.E.2d at 918 (to demonstrate ineffective assistance of counsel for failure to object, the petitioner must establish that the objection would have been sustained).

[26] Chamorro also argues that his trial counsel was ineffective for failing to object to statements made by two witnesses that he claims were "designed to cast Chamorro in a bad light or to convince the jury to convict him based upon prior bad acts that should have been excluded under [Indiana Evidence Rule] 404(b)." (Br. of Appellant at 30.) As an initial matter, Chamorro argues that "the State also elicited testimony from Chapman (Brown's girlfriend) that essentially vouched for Brown's testimony." (*Id.*) Chamorro does not indicate in his appellate brief what those statements were or how they vouched for Brown's testimony, nor does he cite case law to support his argument that those

statements vouched for Brown's testimony. Therefore, he has failed to make a cogent argument as to those statements and the issue is waived from our consideration. *See* Ind. Appellate Rule 46(A)(8) (requiring that contentions in appellant's briefs be supported by cogent reasoning and citations to authorities, statutes, and the appendix or parts of the record on appeal); *and see Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) ("A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied*.

[27] The other statements to which Chamorro feels his trial counsel should have objected were part of testimony from Alexandria Chapman and LaShae Ramsey. Chapman testified that Chamorro said "[s]omething about breaking the dog's neck[,]" (Prior Case Tr. Vol. II at 273), but that she did not know whose dog Chamorro was talking about. LaShae Ramsey testified that she overheard Chamorro say as part of a phone call "Who called my folks a bitch?" (Tr. Vol. II at 494), which Chamorro contends invoked "the improper inference that Chamorro was in a gang." (Br. of Appellant at 30.) Ramsey also testified that Chamorro referred to women as "bitches." (Prior Case Tr. Vol. II at 499.) Ramsey, later in her testimony, read from a letter Chamorro sent her from jail wherein he used a racial slur and indicated he "would kill to see [her] one last time." (Prior Case Tr. Vol. III at 509.) Chamorro has not demonstrated how his trial counsel's failure to object to these random statements scattered throughout multiple pages of testimony prejudiced him in any way, and therefore his argument regarding this issue fails. *See Grinstead*, 845 N.E.2d at

1033 (trial counsel not ineffective for failing to object to testimony because petitioner did not demonstrate he was prejudiced by that failure).

[28] Finally, Chamorro argues his trial counsel was ineffective because he did not object to comments made by the prosecutor during closing argument that Chamorro contends vouch for the testimony of witnesses or "should have drawn either an objection or a mistrial motion or both." (Br. of Appellant at 31.) These comments include the prosecutor's comment that "I do know he was right[,]" when commenting on one witness' testimony, (Prior Case Tr. Vol. III at 625); inferences that Chamorro committed the crime because "he's tired of being disrespected by the people here in good old White County, Indiana[,]" (*id*. at 630), and that Chamorro was "not in the same league" as the victim and the victim's friends, (*id*.); and the prosecutor's commentary regarding Chamorro's proffered lesser-included offense of Class C felony reckless homicide. Like with Chamorro's challenge to testimony from Chapman and Ramsey, Chamorro has not demonstrated any prejudice suffered due to his trial counsel's decision to refrain from objecting to these statements. Accordingly, we conclude Chamorro's trial counsel was not ineffective for failing to object to the challenged statements made by the prosecutor in the course of closing argument. *See Benefield v. State*, 945 N.E.2d 791, 806 (Ind. Ct. App. 2011) (trial counsel did not render ineffective assistance of counsel when he did not object to jury instruction because the failure to object did not prejudice petitioner).

# Conclusion

Chamorro's trial counsel was not ineffective for failing to strike Juror, introduce additional photographs of knives found at the scene, cross examine Breeden and Brown about their inconsistent statements, object to statements made by Chapman and Ramsey, or object to the prosecutor's comments during closing argument. Accordingly, we affirm the denial of Chamorro's petition for post-conviction relief.

Affirmed.

Robb, J. and Vaidik, J., concur.